Esta George ARNOLD and Gale Reiling Harris, Defendants-Appellants,

National Guaranty Corp., Kenneth L. Jackson, Bill C. Smith, Edward George Weiss, Martin Stewart Schlissberg, Chris Stauffer, Harry W. Creely, Arthur D. Story, Richard D. Keating, Steven Bruce Sias, Non-Appealing Defendants,

v.

Kenneth DIRRIM and Wynell Dirrim, Individually and as Representatives of a Class, Plaintiffs-Appellees.

No. 3–677A142.

Court of Appeals of Indiana, Third District.

Dec. 19, 1979.

**HOFFMAN, Judge.**

On July 21, 1972 plaintiffs-appellees Kenneth and Wynell Dirrim initiated an action against National Guaranty Corporation (NGC) and Kenneth Jackson, its president, to recover their investment in NGC. Dirrims alleged that they purchased 1,000 shares of NGC stock in July 1970 for $10,000 and another 500 shares in April 1971 for $5,000 pursuant to a false and misleading prospectus. On April 13, 1973 Dirrims filed an amended complaint adding as defendants the nine individuals who were officers and/or directors of NGC including defendant-appellant Esta G. Arnold. In addition to seeking permission to bring their suit as a class action on behalf of all purchasers of NGC stock after October 15, 1969, Dirrims alleged that the actions of NGC in selling its securities were violative of the Indiana Securities Act, IC 1971, 23–2–1–1 to 23–2–1–25 (Burns Code Ed.) because (1) all sales after October 15, 1969 were made pursuant to a false, misleading and inadequate prospectus, IC 1971, 23–2–1–19(a), and (2) all stock sold after October 15, 1970 when the prospectus expired was unregistered. IC 1971, 23–2–1–3. The trial court found Arnold liable under IC 1971, 23–2–1–19(b),[1] the derivative liability section of the Securities Act, for NGC's sales during these two periods.

Arnold has posited sixteen issues for consideration on appeal. For the sake of clarity and convenience, these questions have been restated and rearranged as follows:

(1) whether the trial court erred in finding that the prospectus was inadequate and otherwise failed to disclose material facts;

(2) whether the trial court erred in finding Arnold liable without determining that he materially aided in the sales of securities;

(3) whether the trial court erred in finding that Arnold failed to prove the special statutory defense in IC 1971, 23–2–1–19(b);

Vincent J. Heiny and Sherrill W. Colvin, Snouffer, Haller & Colvin, Fort Wayne, for defendants-appellants.

Martin T. Fletcher, Rothberg, Gallmeyer, Fruechtenicht & Logan, Fort Wayne, for plaintiffs-appellees.

1. This statute was amended in certain immaterial ways by Acts 1975, P.L. 261, § 15, p. 1402.

(4) whether reliance is an element of a purchaser's claim under IC 1971, 23–2–1–19(a) for rescission of stock purchases;

(5) whether the trial court abused its discretion in denying Arnold's motion for a separate trial;

(6) whether the trial court erred in permitting Dirrims' action to proceed as a class action;

(7) whether the trial court abused its discretion in failing to require each member of the class to file a proof of claim;

(8) whether the trial court abused its discretion in allowing Dirrims to file an amended complaint;

(9) whether the class was barred by estoppel, estoppel by laches or laches;

(10) whether the trial court erred in denying Arnold a right to trial by jury;

(11) whether the filing of the amended complaint constituted a filing by all persons who were subsequently found to be members of the class;

(12) whether the burden of proof was on Arnold to prove his statute of limitations defense;

(13) whether the trial court applied an erroneous rule of law regarding when the securities violations were discovered;

(14) whether the award of attorney fees was contrary to the evidence;

(15) whether the hearing on attorney fees was held without sufficient notice; and

(16) whether Arnold was denied a fair trial.

Arnold maintains the trial court erred in finding that the prospectus failed to contain facts required by IC 1971, 23–2–1–5(b)(1) or otherwise omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. He also insists that any alleged omissions would not have materially affected any purchaser's decision to acquire the stock.

In the case of registered securities, IC 1971, 23–2–1–5(d) imposes certain minimum requirements on the contents of a prospectus to be used in connection with a stock offering. This statute provides in pertinent part:

"The commissioner shall require as a condition of registration of any security under this section 204 [23–2–1–5] that an adequate prospectus be sent or given to each person to whom an offer is made or from whom an offer to buy is solicited[.]

\* \* \* \* \* \*

"The prospectus shall be adequate if it contains all of the information specified in section 204(b)(1) [subsection (b)(1) of this section.]"

A prospectus which does not include the information required by section 204(b)(1) [23–2–1–5(b)(1)] is therefore inadequate. The sale of a security through the use of an inadequate prospectus is a specified basis for civil liability under IC 1971, 23–2–1–19(a)(1).

"Any person who offers or sells a security in violation of sections 201[23–2–1–3], *204(d) [subsection (d) of 23–2–1–5]* . . is liable to the person buying the security from him." (Emphasis added.)

In general, the trial court found the prospectus was inadequate because it failed to disclose: material transactions between NGC and Guaranty Management Corporation (GMC); control of GMC by NGC's directors; facts surrounding GMC's acquisition, control and resale of NGC stock; the fact that GMC had created the $10 market price for NGC stock; the transactions between NGC and the Pyramid Corporation of Michigan (Pyramid); and the indirect ownership of NGC shares by its directors through GMC, Pyramid and other entities.[2]

Arnold claims that both the GMC and Pyramid transactions were disclosed. The

---

2. The trial court also found that the prospectus was not amended to reflect the collapse of the Pyramid transaction around December 2, 1969.

sole reference to GMC in the prospectus is at Note 2 of NGC's 6/30–69 financial statement. It reads:

"Note 2: On July 1, 1969, a 6% note, due July 1, 1970, was executed in the aggregate amount of $101,782.56 to consolidate the principal and interest owing to Guaranty Management Corp. as of June 30, 1969."

The only statements in the prospectus about Pyramid showed that Pyramid held 172,000 shares of Class B common stock in NGC and that NGC directors Edward Weiss, Martin Schlissberg and Richard Keating were also officers and/or directors of Pyramid.

■ Among the facts which must be contained in a prospectus are the amount and kind of consideration for which the issuer has issued any of its securities within the two years preceding the registration date. IC 1971, 23–2–1–5(b)(1)(G). The trial court found that the prospectus failed to disclose that on July 16, 1968, the directors of NGC unanimously voted to issue 3,000 shares of its common stock to GMC for services rendered even though GMC was not incorporated at that time. The prospectus also omitted to state that on December 4, 1968, NGC sold 10,000 shares of its common stock to GMC at $5 per share. Furthermore, the prospectus failed to show that on September 8, 1969, NGC issued 8,000 shares to Pyramid which paid nothing for them. Each of these issuances was required by law to be disclosed. Hence the trial court properly held that the prospectus violated IC 1971, 23–2–1–5(b)(1)(G).

A prospectus is also required to include any material interest of any officer or director in any material transaction with the issuer or any affiliated corporation within three years of the registration date, IC 1971, 23–2–1–5(b)(1)(B), and every material contract made within two years prior to registration. IC 1971, 23–2–1–5(b)(1)(K). Moreover, a prospectus must contain all material information not expressly required that is necessary under the circumstances to make the statements made not misleading. IC 1971, 23–2–1–5(b)(1)(P); Ind.Admin. Rules & Regs. (23–2–1–5)–2 (Burns Code Ed.).

The trial court found that the prospectus failed to disclose that NGC directors Harris, Jackson, Sias, Stauffer and Arnold were also directors and principal shareholders of GMC. Nor did it reveal that GMC's officers were the same as NGC or that its books and records were maintained by NGC officers and employees. It also omitted to state that the function of GMC was to operate as a holding company through which its principals would loan funds to NGC which in turn would channel the money to National Guaranty Mutual Life Insurance Company (NGMLI) for the purpose of providing the necessary minimum capitalization for the creation of a mutual insurance company in Indiana. As soon as NGMLI was functioning, NGC would provide managerial and agency services to it and receive fees and commissions which would then be used by NGC to repay GMC. Additionally, the prospectus did not show that GMC acquired a total of 14,856 shares of NGC stock at price ranging from $2 to $5 per share between July 16, 1968 and October 15, 1969. Furthermore, the prospectus omitted to state that the $101,000 which GMC loaned to NGC was obtained by borrowing from its officers and directors, primarily Messrs. Sias, Harris, Stauffer or Arnold.

It also omitted to reveal that GMC had been selling its stock only from July 25, 1969 through October 15, 1969 at $10 per share or that the $10 market price for NGC stock was established by GMC's sales of NGC stock to various persons. The trial court further found that the prospectus failed to reflect an accurate percentage of the ownership of NGC stock held directly or indirectly by its directors. The prospectus did state that NGC's directors held as of October 1, 1969, 18,726 shares as a group or 21% of NGC's total shares. These shares, however, were only of shares held directly in the names of NGC's directors and their wives. Considering an additional 19,004 shares held indirectly, the true percentage of ownership would be 42%.

Regarding the Pyramid transaction, the trial court found that the prospectus failed

to disclose that in August 1969, NGC's directors met with Messrs. Weiss and Schlissberg in Fort Wayne for the purpose of obtaining the necessary capital and personnel to pursue its public offering. At this meeting the parties entered into an arrangement whose essential features can be described in this way: NGC and Pyramid would have an equal number of class A and class B stock in their respective corporations. Both would register 100,000 shares of their class A stock for sale to the public at $10 per share. Although class B stock was not entitled to dividends, it did possess voting rights and thus represented control. NGC agreed to acquire 188,000 shares of Pyramid's class B stock at 1 cent per share and 1,764 shares of its class A stock at $10 per share. NGC also issued 8,000 shares of class A stock for no consideration at all. In return, Pyramid was committed to purchase 172,000 shares of NGC's class B stock at 1 cent per share. Consequently, this stock exchange would place Pyramid in control of NGC and vice versa. Furthermore, Pyramid agreed to loan $5,000 to NGC so that it could cover the cost of its prospectus and registration fees. Finally, Messrs. Weiss, Schlissberg and Keating were made directors of NGC.

■ The central consideration in determining materiality is whether a reasonable investor would attach importance to the information when deciding on his course of action. *Holmes v. Bateson* (1st Cir. 1978), 583 F.2d 542. The materiality of the omissions in the instant case is beyond question. These omissions should have been disclosed in order to make the statements made in the prospectus not misleading. Certainly, an average prudent investor would attach significance to the fact that NGC's largest creditor was its own directors through GMC; that GMC made bargain purchases of 14,856 shares of NGC stock and then sold 5,571 shares to certain persons in order to create a $10 market price; that NGC agreed to acquire $17,640 of Pyramid stock and issued $80,000 of its own class A stock to Pyramid for no consideration at all even though NGC had to borrow $5,000 from Pyramid to pay for its expenses incident to the stock registration; and that the Pyramid transaction was effected to perpetuate control in the NGC directors.

The trial court was correct in concluding that the prospectus was inadequate and otherwise failed to disclose material facts necessary to make the statements made not misleading.

■ Having held that NGC's stock sales violated IC 1971, 23–2–1–19(a), the next question that must be addressed is whether the trial court erred in finding Arnold liable for the transactions without determining that he materially aided in the sales. IC 1971, 23–2–1–19(b), the derivative liability section of the Indiana Securities Act, states:

"Every person who directly or indirectly controls a seller liable under subsection (a) [IC 23–2–1–19(a)], every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons so liable."

Arnold suggests that the clause "who materially aids in the sale" modifies "every partner, officer, or director of such a seller". Plaintiffs argue that the proper construction of this portion of the statute requires that every director, regardless of whether he materially aided in any way is liable unless he sustains the burden of proof that he did not and could not reasonably have had knowledge of the facts on which liability was predicated.

From a grammatical standpoint, with due regard for punctuation, it seems apparent that this statutory provision imposes absolute liability upon the director of a corpora-

tion to purchasers of securities sold in violation of the Securities Act based on his position as a director unless he proves the statutory defense. It should be observed that the clause in question obviously relates only to employees of the seller, broker-dealers or agents. If it had been the intent of the General Assembly to make directors liable only in the event they had materially aided in the sale, it would have been an easy matter to have the statute read "every partner, officer, or director of such a seller *who materially aids in the sale.*" (Emphasis added.)

Support for this view can be found in several other jurisdictions. Construing a statute identical to IC 1971, 23–2–1–19(b), the court in *Rzepka v. Farm Estates, Inc.* (1978), 83 Mich.App. 702, 269 N.W.2d 270 held that where the individual defendants clearly failed to establish their lack of knowledge they were liable in their positions as directors and officers of the corporation. In *Foelker v. Kwake* (1977), 279 Or. 379, 568 P.2d 1369, the defendant argued that the evidence did not reflect in any way her participation in any of the illegal transactions. The court responded:

> "Under the provisions of ORS 59.115(3), however, no such personal participation need be proved to impose liability, it being sufficient that the defendant was an officer of the corporation, unless the defendant sustains the burden of proof that he or she did not and could not reasonably have had knowledge of the facts on which liability was based. There was evidence in this case that Nancy Kwake was an officer of Verde. She testified that she did not 'participate' in the business activities of Verde, but offered no evidence that she did not know or could not reasonably have known of the existence of the facts on which liability was based, as required by ORS 59.115(3)." (Footnote omitted.) 568 P.2d at 1373.

*See also, Moerman v. Zipco, Inc.* (E.D.N.Y. 1969), 302 F.Supp. 439 (statute imposes liability on an employee of a seller only if he materially aids in the sale but puts no similar restrictions on the liability of a partner, officer or director); *Mitchell v. Beard* (1974), 256 Ark. 926, 513 S.W.2d 905 (while an employee, broker or agent must materially aid in the sale before he becomes liable, that requirement is not applicable to a partner).

Arnold also claims he established the lack of knowledge defense under the statute. He urges that the evidence shows he was misled by Jackson's assurances that all NGC stock sales complied with the security regulations of Indiana and points to his own alleged lack of business acumen to fortify his assertion.

 Since the trial court found against Arnold on this issue, he is appealing from a negative judgment. A negative judgment may be reversed if it is contrary to law. *Kroger Co. v. Haun* (1978), Ind.App., 379 N.E.2d 1004. Where a party attacks a judgment as contrary to law, only the evidence most favorable to the appellees, together with all reasonable inferences therefrom, can be considered. It is only when the evidence leads to but one conclusion and the trial court has reached an opposite conclusion that the decision of the trial court will be disturbed as contrary to law. *Chaney v. Tingley* (1977), Ind.App., 366 N.E.2d 707.

 An examination of the record belies Arnold's contentions that he did not know and could not have reasonably known about the facts giving rise to the securities violations. The prospectus was effective from October 15, 1969 to October 14, 1970. As to the sales under this prospectus, Arnold admitted that he attended the meeting where the Pyramid transaction occurred and NGC's minutes for August 28, 1969 reveal that he voted in favor of it. Through his various positions as officer, director and shareholder of GMC, Arnold certainly knew of GMC's transactions in NGC stock. In fact, he accepted delivery of certificate No. 534 for 10,000 shares of NGC stock in December 1968 on behalf of GMC. Additionally, director Harris indicated that all the NGC directors personally reviewed the prospectus at one of their board meetings in 1969.

Concerning the sales of unregistered stock, Arnold routinely received or heard updated reports at board meetings about NGC's stock sales activities. As a NGC director, Arnold also received copies of NGC's financial statements which disclosed that the corporation was still selling its stock during 1970–1 and that commissions were being paid in connection with these sales. In January 1971 Arnold attended a meeting at which Jackson introduced Hugh McDowell as an excellent salesman who was to be employed by NGC to sell its stock. In September 1971 Arnold inquired as to where the proceeds from the stock sales were going. Subsequently, he was shown a complete listing of NGC's stock sales and commissions to that date. Arnold also supplied Robert Pleak, an NGC stock salesman, with the names of prospective shareholders in 1971. Clearly, the evidence does not lead irresistibly to the conclusion that Arnold did not know of the facts giving rise to the statutory transgressions.

 Actually, the bulk of Arnold's argument focuses not on his lack of knowledge about the facts but rather that he was unaware the law attached significance to those facts. He directs attention to the portions of the transcript indicating that he relied on Jackson's representations and judgment that the sales were proper. Moreover, he proposes that an affirmative defense requiring "a director need only have a good faith belief that the sales are legal in order to escape liability" should be engrafted into the statute.

These assertions miss the mark. The statute imposes liability on those who know the applicable facts without regard to their knowledge of the law. *Rzepka v. Farm Estates, Inc., supra.* Pertinent to this conclusion is the following language from *Moerman v. Zipco, Inc., supra,* 302 F.Supp. at 450:

"Nothing persuades this court that Connecticut or the drafters of the Uniform Laws intended to do away with the common law rule that ignorance of the law is no defense. The Connecticut statute provides only that ignorance of the applica-

ble facts, after the exercise of reasonable care, is a defense. There is no suggestion that defendant's knowledge of the law is a necessary element of a cause of action." Reasonable care is a question of fact which must be determined by taking into account all the circumstances. While the relative sophistication of a director and his reasonable reliance on information purporting to be made on the authority of an expert may be relevant factors in ascertaining his knowledge of the facts, they are not the sole determinants for establishing his liability.

Certainly if the Legislature had intended to establish a good faith defense, it would have included such in the wording of the statute. The courts cannot add something to a statute that the Legislature has purposely omitted. *Town of Schererville v. Vavrus* (1979), Ind.App., 389 N.E.2d 346.

 Arnold next asserts that IC 1971, 23–2–1–19(a) requires a showing of reliance, citing the following language from the statute:

"Any person who . . . offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . . is liable . . . ."

Arnold posits that if there was no reliance then the sale was not made "by means of" an untrue statement or omission.

This position must be rejected. The "by means of" clause was not intended as a requirement that the the buyer prove reliance on the untrue statement or omission. The buyer need only show that he did not know of the untruth or omission. 3 Loss, Securities Regulations 1645 (1961). Thus reliance was not an element to be proven under IC 1971, 23–2–1–19(a).

The next contention made by Arnold is that the trial court erred in denying his motion for a separate trial. He claims prejudice resulted to his cause because NGC had stipulated to all facts necessary to find it liable to the class and because its presi-

dent, Kenneth Jackson, had confessed judgment.

The granting of a motion for a separate trial is governed by Ind.Rules of Procedure, Trial Rule 42(B):

"The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury."

The action of a trial court in refusing a motion to separate will not be reversed unless an abuse of discretion is shown. *Central Ind. Rwy. Co. v. Anderson Banking Co.* (1968), 143 Ind.App. 396, 240 N.E.2d 840.

In ruling on the motion, the trial court must necessarily balance the interests of convenience and economy against the likelihood of substantial prejudice to the defendant's case. Economy of time, money and effort requires, if practicable, that the entire controversy be determined by one trial. It is the policy of the law to limit the number of trials as far as possible. *N. I. P. S. Co. v. Otis* (1969), 145 Ind.App. 159, 250 N.E.2d 378.

Here the trial court could properly consider that insofar as the character of the issues, the facts and evidence to be presented at trial would be the same whether separate trials were held or not, the policy of avoiding duplicity of litigation with its concomitant expense outweighed any possible prejudicial impact to the defendant. While NGC did stipulate to all facts necessary to find it liable to the class, Arnold was not a party thereto and consequently could not be bound by the stipulations. *Hawkins v. Hawkins* (1974), 160 Ind.App. 5, 309 N.E.2d 177. Nothing more appearing, it must be presumed that the trial court, as the trier of fact, disregarded the stipulations in making its independent determination that Arnold was liable. Furthermore, Jackson's confession of judgment could have had no effect on the court's ruling since Jackson did not confess judgment until six months after the motion to separate was denied. Arnold did not renew his motion upon the occurrence of that event. For these reasons, the trial court was well within its discretion when it overruled the motion.

Arnold maintains the trial court erred in permitting Dirrims' suit to proceed as a class action. His attack is based on allegations that the questions of law or fact common to the members of the class did not predominate over questions affecting individual members and that Dirrims' claims were not typical of the class.

Satisfaction of the predominance criterion depends on whether the claims of the class members derive from a common nucleus of operative facts. *Entin v. Barg* (E.D. Pa.1973), 60 F.R.D. 108. Here the essence of the class members' claims were:

1) whether the October 1969, prospectus was inadequate, false and misleading;

2) whether sales after October 15, 1970 were sales of non-exempt unregistered shares; and

3) whether defendants knew or reasonably could have known of the facts rendering the sales unlawful.

The facts surrounding the violation of the disclosure requirements for the prospectus and the sales of unregistered securities would be largely the same for all class members. Hence this common nucleus of facts satisfied the predominance requirement of Ind.Rules of Procedure, Trial Rule 23(B)(3). *See: Kramer v. Scientific Control .Corp.* (E.D.Pa.1975), 67 F.R.D. 98; *Morris v. Buchard* (S.D.N.Y.1971), 51 F.R.D. 530.

In determining that Dirrims' claims were typical of the class, it should be observed that rather than demanding proof of the existence of identical claims, TR. 23(A)(3) requires only a showing that the representative plaintiffs' interests are not antagonistic or in conflict with the class as a whole. *Metge v. Baehler* (S.D.Iowa 1978), 77 F.R.D. 470. Under this approach the typicality prerequisite may be satisfied if the claims or defenses of the representatives and class

members stem from a single event or are based on the same legal theory. 7 Wright and Miller, Federal Practice and Procedure: Civil § 1764. Here the underlying claims were based on the same operative facts and every class member shared an interest with the Dirrims in establishing Arnold's liability under the Securities Act. Arnold has not shown how Dirrims' claims are antagonistic or in conflict with the class.

■ Arnold also urges that the trial court abused its discretion in not ordering each member of the plaintiff class to file a proof of claim under TR. 23(D). He submits that this approach should have been utilized in order to provide the court and the litigants with the identity of the potential claimants and the amount of damages they may have suffered.

Trial Rule 23(D) gives the trial court broad discretionary powers to issue orders protecting the various interests involved in class actions. Given the complexity of managing large class actions, it has been necessary for some Federal courts to request class members to furnish information pertaining to the circumstances under which their claims arose as well as the amounts of their claims. *See: Iowa v. Union Asphalt & Roadoils, Inc.* (S.D.Iowa 1968), 281 F.Supp. 391, aff'd, 408 F.2d 1171 (8th Cir. 1969); *Philadelphia Elec. Co. v. Anaconda Am. Brass Co.* (E.D.Pa.1968), 43 F.R.D. 452; *Harris v. Jones* (D.Utah 1966), 41 F.R.D. 70.

In the instant case, however, there was no reason to adopt this proof of claim method. From the stock issue records of NGC introduced at trial, the court could readily ascertain the names and addresses of potential class members; the certificate number and quantity of shares bought; and the issuance and delivery dates of the stock.

There was also extensive information about the price paid for the stock by class members. The record shows that between October 15, 1969 and October 15, 1970 all NGC stock was sold at $10 per share. Moreover, every class member who purchased during this period executed a subscription agreement which revealed his name, address, number of shares purchased

and the price paid. For sales after October 15, 1970, NGC maintained photostatic copies of checks received from class members or subscription agreements. Additionally, the bank deposit records of NGC provided another source for determining the consideration. Finally, NGC's bookkeeper prepared a summary of all NGC stock sold from October 15, 1969 to September 1972 which reflected the names of purchasers, the dates of purchase, the number of shares bought and the price paid.

All of these exhibits were available for the trial court's inspection. In light of these facts, it cannot be said that the trial court abused its discretion.

■ Arnold next alleges that the trial court abused its discretion in allowing the Dirrims to amend their complaint. He contends that he has been prejudiced by the amendment because it forced him to defend a suit concerning circumstances over four years old and has exposed him to far greater liability than if he had been sued earlier.

The original complaint was filed on July 21, 1972. When the Dirrims moved to amend their complaint on April 13, 1973 to include the NGC directors as defendants and to request that the suit be brought as a class action, no responsive pleading had yet been filed by the original defendants, Jackson and NGC. Moreover, the motion to amend was filed over four years prior to trial.

It has been the policy of Indiana law to freely allow the amendment of pleadings to bring all matters at issue before the court. *Huff v. Travelers Indemnity Co.* (1977), 266 Ind. 414, 363 N.E.2d 985. Ind.Rules of Procedure, Trial Rule 15(A) provides that pleadings may be amended once as a matter of course at any time before a responsive pleading is served. Since no responsive pleading to the original complaint had been served, Dirrims were entitled as a matter of right to amend their complaint. Under these circumstances, there was no need to seek the permission of the trial court in order to amend the complaint.

■ Arnold also maintains the trial court erred in failing to find that the class was barred by estoppel, estoppel by laches and laches. In its findings of fact the trial court stated:

"49. The individual Defendants failed to prove by a preponderance of the evidence that the named Plaintiffs or any class member had engaged in any act or omission to act or in any conduct which would estop such Plaintiffs or any member of the class from asserting the claims herein asserted."

This finding that Arnold failed to prove his affirmative defenses is in fact a negative one as to him. A negative judgment may be reversed only if it is contrary to law. *Kroger Co. v. Haun, supra.* In his motion to correct errors, Arnold asserted that:

"The decision is contrary to the clear evidence that many of the alleged class members are estopped, estopped by laches, are guilty of laches, are *in pari delicto*, and therefore cannot recover." (Original emphasis.)

Thus, the assignment in his motion that the decision was contrary to the clear evidence presents nothing for consideration on appeal. *National Life & Acc. Ins. Co. v. Neuhoff* (1967), 140 Ind.App. 603, 224 N.E.2d 690.

The next issue presented by this appeal is whether the trial court erred in denying Arnold a trial by jury. IC 1971, 23–2–1–19(a) provides generally that any person who bought stock sold in violation of the Indiana Securities Act

"[m]ay sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent [6%] per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent [6%] per year from the date of disposition."

■ Under the directive of *Hiatt v. Yergin* (1972), 152 Ind.App. 497, 284 N.E.2d 834, the right to jury trial is to be determined by reference to the essential character and nature of the claim for relief sought. Where the pleadings are of the notice variety, the trial court must necessarily turn to the totality of the proceedings before it to ascertain whether the claim is essentially equitable or legal in nature.

"TR. 16(A)(1) provides an excellent opportunity for the trial court to aid in formulating and simplifying the issues by requiring the attorneys to participate in a pretrial conference for this purpose. Such a conference should be frequently used because it is often the only effective way of applying 'the ancient yardstick.' " 284 N.E.2d at 847.

■ Here that portion of the pretrial order setting forth the contentions of the parties expressly stated that the plaintiff class was seeking rescission of its stock purchases and restitution of the purchase price paid. Rescission in the sense of the return of money upon tender of the securities is an equitable remedy and is actually restitutionary in character. *McCauley v. Michael* (1977), Minn., 256 N.W.2d 491. Hence the trial court properly denied Arnold a jury trial.

■ To obviate this conclusion Arnold insists that even if the action is regarded as a statutory action for rescission against NGC, it is nonetheless an action for damages against the individual directors because the stock proceeds were received by the corporation and not by the directors. Thus he claims that he was entitled to a jury trial. This assertion ignores the clear language in *Hiatt v. Yergin, supra,* that where an essential part of the plaintiffs' claim is for equitable relief, the whole is drawn into equity.

" '*The court, having acquired jurisdiction of* * * * *a suit in equity* * * * *was not bound to dissect the suit into separate members,* and try each separate-

ly, one member as a matter of law, and the other as a matter of equity, but had a right to *treat the case as a unity*, and as one of exclusive equitable jurisdiction.

\* \* \* \* \* \*

" 'Where questions are so closely blended and so firmly interlaced \* \* \*, there can be no severance and no separate trials. One trial, or, to speak more accurately, one hearing, ends the whole controversy.

" 'It would lead to confusion and injustice to direct separate trials in such cases. Should a jury find there was no right to recover on the [legal cause of action], and the court adjudge that there was a right to recover on the [equitable cause of action], there would then be a conflict not easily overcome. To be sure, the court might set aside the verdict and grant a new trial, but this, after all, would leave the control with the court, and it might just as well be there in the first instance.' " (Original emphasis.) 284 N.E.2d 845.

■■■ Arnold alleges that the trial court erred in finding that the filing of the amended complaint, which sought to bring this suit as a class action, constituted a filing by all persons who were subsequently found to be members of the class. He proposes that the trial court should have found that the applicable statute of limitations, IC 1971, 23–2–1–19(b) (Burns Code Ed.), was not tolled until the class was certified on April 9, 1974, since it was not until then that the putative members became parties to the suit. Thus, he reasons that all class members who purchased stock on or before April 13, 1971 are barred by the two-year statute of limitations which runs from the date of discovery of the Securities Act violations.

The amended complaint was filed on April 13, 1973. The trial court found that neither the Dirrims nor any class member discovered the violations of the Securities Act prior to April 13, 1971. Accordingly, the court ruled that the statute of limitations was no bar to this cause.

Key to the resolution of this issue is the question of the treatment to be accorded a class action during the period between the filing of the suit and the ruling on a motion to certify. Professor Moore is of the view that during this interim period the suit should be treated as a class action. If the court then determines that the suit should proceed as a class action, the action should be considered as having been a class action from the date of commencement rather than the certification date. 3B Moore's Federal Practice ¶ 23.50 at 23–434.

This view of the nature of an uncertified class action has been embraced by courts dealing with class action questions in a variety of contexts. For example, in *Philadelphia Elec. Co. v. Anaconda American Brass Co., supra*, 42 F.R.D. 324, it was held that TR. 23(E), dealing with the dismissal or compromise of a class action, applies to uncertified class actions. In *Leisner v. New York Telephone Co.* (S.D.N.Y.1973), 358 F.Supp. 359, the court established that a preliminary injunction, the hearing for which was held prior to class certification, nevertheless inures to the benefit of members of the class. Most importantly, the Supreme Court in *American Pipe & Construction Co. v. Utah* (1974), 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713, held that the filing of a class action tolls the statute of limitations during the period between the filing of the class action and the court's ruling on the question of class certification.

Particularly persuasive is the following language from *American Pipe, supra*, 414 U.S. at 550, 94 S.Ct. at 764–65;

"Under present Rule 23, however, the difficulties and potential for unfairness which, in part, convinced some courts to require individualized satisfaction of the statute of limitations by each member of the class, have been eliminated, and there remain no conceptual or practical obstacles in the path of holding that the filing of a timely class action complaint commences the action for all members of the class as subsequently determined. . . To hold to the contrary would frustrate the principal function of a class suit, be-

cause then the sole means by which members of the class could assure their participation in the judgment if notice of the class suit did not reach them until after the running of the limitation period would be to file earlier individual motions to join or intervene as parties—precisely the multiplicity of activity which Rule 23 was designed to avoid in those cases where a class action is found 'superior to other available methods for the fair and efficient adjudication of the controversy.' "

This reasoning applies with equal force to the case at bar. Since the instant suit was filed as a class action and was duly certified as such, this case should be treated as if it were a certified class action from the day the amended complaint was filed.

Arnold also submits the trial court erred in finding that the burden of proof was upon him to prove that either the Dirrims or any class member discovered the securities violations more than two years prior to April 13, 1973. Arnold suggests that each class member who seeks to recover should be required to prove when he discovered the violations.

The salient portion of the statute in question reads:

"Action under this section shall be commenced within two [2] years after discovery by the person bringing the action of a violation of this act [23–2–1–1—23–2–1–25], and not afterwards."

This provision has recently been held to constitute a statute of limitations. *Green v. Karol* (1976), Ind.App., 344 N.E.2d 106.

■ The general rule is that the party pleading the statute of limitations has the burden of proving that the cause of action accrued more than the statutory time before the commencement of the action. *Sullivan v. O'Sullivan* (1959), 130 Ind.App. 142, 162 N.E.2d 315. While conceding the applicability of this rule, Arnold nevertheless reasons that insofar as the party who relies on facts in avoidance of a statute of limitations has the burden of proving such facts, therefore plaintiffs must prove their discovery.

■ Apparently Arnold has misconstrued the interrelationship between these two evidentiary rules. In raising the statute of limitations as an affirmative defense, the burden of going forward with evidence that a claim is barred rests on the party asserting the defense. Once the party makes a prima facie case, the burden shifts to the other party who is then obliged to prove such facts as will prevent the running of the statute. This burden of production may shift several times in one case yet the burden of persuasion remains on the party asserting the bar.

■ In the instant case, Arnold failed to establish a prima facie case that the plaintiffs' claims were barred. In fact, the only testimony relating to the time of discovery came from Mr. Dirrim who indicated that he became aware of the securities violations around April 13, 1971. The trial court properly ruled that the burden of proof fell on Arnold.

■ Arnold argues that the trial court applied an erroneous rule of law as to when the securities violations were discovered. He insists that IC 1971, 23–2–1–19(e) requires a suit to be filed within two years of the date when the plaintiff either discovered or in the exercise of reasonable care should have discovered the violations. The applicable statute reads:

"Action under this section shall be commenced within two [2] years after discovery by the person bringing the action of a violation of this act [23–2–1–1—23–2–1–25] and not afterwards." [3]

This language is quite clear. It provides that an action under the Securities Act must be commenced within two years after discovery of the violation. There is nothing in this language which intimates a reasonable diligence standard.

The next contention advanced by Arnold is that the award of $112,267.18 in attorney

---

**3.** This statute was amended by Acts 1975, P.L. 261, § 15, p. 1402.

fees was contrary to the evidence.[4] Relying on the testimony of plaintiffs' counsel that he devoted 1,068.3 hours to the case, that his customary rate for matters not involving any contingent fee arrangement was $50 per hour, and that he incurred $5,867.18 in expenses, Arnold maintains the evidence can only support a judgment for $59,282.18.

However, plaintiffs' counsel also testified that it is a common practice to award attorney fees in class action suits which are predicated upon 33% of the recovery or settlement fund. Applying that formula here would have amounted to an award approximating $164,000.

When awarding attorney fees the trial court is empowered to exercise its sound discretion and any successful challenge to its determination must demonstrate an abuse thereof. *Johnson v. Johnson* (1979), Ind.App., 389 N.E.2d 719. Abuse of discretion occurs only when the result is clearly against the logic and effect of the facts and circumstances before the court. *Burkhart v. Burkhart* (1976), Ind. App., 349 N.E.2d 707. The fact that the same circumstances might justify a different outcome does not permit the substitution of this Court's judgment for that of the trial court.

Here the evidence on attorney fees ranged from $59,000 to $164,000. Moreover, another factor available to the determination of a proper fee is the trial court's personal knowledge of the practice of law and appropriate compensation therefor in the action before it. Thus, the award of $112,267.18 does not appear to be excessive.

Arnold also contends that the hearing on attorney fees was held without sufficient notice. The pretrial order specifically reserved a ruling on attorney fees until after the trial of the securities claims. The trial court's judgment on these claims was filed January 3, 1977 at which time it set the hearing on fees for January 7, 1977. At the hearing Arnold moved for a continuance because of his counsel's inability to prepare but the trial court denied the motion on the grounds the Indiana Supreme Court had ordered that the case be decided by January 10, 1977. However, the trial court did continue the proceedings until January 10, 1977 so that counsel could study the time and expense records of plaintiffs' counsel. When the hearing resumed on January 10, 1977 Arnold cross-examined plaintiffs' counsel in considerable detail about his request for fees. There was no error here.

Lastly, Arnold urges that the trial court denied him a fair trial because it waited eight months before rendering its decision. He asserts that as a result of this delay the trial court could no longer recall the evidence and merely xeroxed the plaintiffs' proposed findings of fact. Additionally, Arnold cites sixteen alleged discrepancies in the final findings of fact which purport to illustrate the trial court's inability to deliberate.

After reviewing the entire record, there is no doubt that the trial court ably performed its function and rendered a decision which was the product of its independent analysis and reflection. The findings are carefully drawn, encompass considerable detail and relate specifically to evidence in the record. The fact that the trial court adopted certain proposed findings does not detract from their legal force or effect. Arnold has not demonstrated that he was denied a fair trial.

No reversible error having been shown, the judgment of the trial court must be affirmed.

Affirmed.

GARRARD, P. J., and STATON, J., concur.

---

4. While the trial court did award a total of $112,267.18 as attorney fees, only $59,067.18 was assessed against Arnold. The other $53,- 200 is a claim by plaintiffs' counsel from the recovery fund.