# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**MATTHEW R. LAYDON**
Gambs Mucker & Bauman
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**WILLIAM P. KEALEY**
**LIA M. HANSON**
Stuart & Branigin LLP
Lafayette, Indiana

**FILED**

Feb 04 2013, 8:27 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CONNIE S. LANDERS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 79A04-1204-CT-191 |
| | ) | |
| WABASH CENTER, INC., | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE TIPPECANOE SUPERIOR COURT
The Honorable Thomas H. Busch, Judge
Cause No. 79D02-1104-CT-17

February 4, 2013

**OPINION - FOR PUBLICATION**

**SHEPARD, Senior Judge**

Stephen McAninch stole over $4 million from his employer, Wabash Center, Inc., during and after his marriage to Connie Landers. After Wabash discovered the theft, it determined that Landers had received a portion of these ill-gotten gains and sued her for return of its money. The trial court entered judgment for Wabash.

Landers says the court's decision must be reversed because Wabash's claim is barred by the statute of limitation and because there is insufficient evidence to support the judgment. We affirm.

FACTS AND PROCEDURAL HISTORY

Landers and McAninch married in 1984. Landers had a son by a previous marriage, and Landers and McAninch had a son together. They built a house in 1994. When Landers and McAninch divorced in 1998, Landers received the home in the divorce settlement and still owns it. Pursuant to the terms of the divorce decree, McAninch paid Landers spousal maintenance through 2004 and child support through 2006.

Wabash is a not-for-profit agency in Lafayette that provides education to children with developmental disabilities and independent living, employment, and community involvement assistance to adults. Wabash hired McAninch in 1986, and he managed Wabash's finances under various titles until his death in 2009. During that time, McAninch developed and directed Wabash's financial management practices.

Unfortunately, he also created an elaborate procedure to divert Wabash's funds for his personal use. McAninch created a fictitious business called S & S Enterprises. From

2

1991 through 2009, he gave Wabash's controller fake invoices from S & S for services that were never rendered. Wabash had a policy requiring the approval of its board's finance committee for expenditures over $7500. McAninch, who was responsible for preparing minutes from the committee's meetings, created false minutes showing approval of expenditures to S & S and submitted the false minutes to the controller along with the invoices. When the controller issued checks to S & S, McAninch deposited them in a bank account held in S & S's name and then withdrew the money. During his marriage with Landers, some of the funds were deposited in their joint bank account.

The scheme began to unravel in October 2009 when Wabash's outside auditor requested confirmation that S & S had actually performed certain building renovations for which Wabash had paid. On October 30, 2009, McAninch committed suicide. Wabash subsequently hired a forensic accountant, whose investigation revealed that Landers had received some of Wabash's stolen funds.

On April 29, 2011, Wabash sued Landers claiming unjust enrichment and other wrongs. After a bench trial, the court found in favor of Wabash and issued findings of fact and conclusions of law. It directed Landers to pay Wabash $836,685 for her share of the stolen funds, plus four years of prejudgment interest of $200,804, for a total of $1,037,489. The court granted Wabash an equitable lien on Landers' home. This appeal followed.

ISSUES

Landers' claims on appeal are as follows:

I.      Whether Wabash's lawsuit is barred by the statute of limitation, and

II.     Whether the trial court's judgment is supported by sufficient evidence.

DISCUSSION AND DECISION

When the trial court enters findings of fact and conclusions of law, we apply a two-tiered standard of review. *Troutwine Estates Dev. Co. v. Comsub Design & Eng'g, Inc.*, 854 N.E.2d 890, 896 (Ind. Ct. App. 2006), *trans. denied*. We first address whether the evidence supports the findings, and then whether the findings support the judgment. The trial court's findings and conclusions will be set aside only if they are clearly erroneous. We do not reweigh the evidence or reassess witness credibility, but consider only the evidence favorable to the judgment. *Id.* Where a pure question of law is involved, our standard of review is de novo. *Id.*

I. Statute of Limitation

Landers says she proved that Wabash commenced its suit beyond the statute of limitation. She further says Wabash did not act with reasonable diligence to discover McAninch's theft because his illicit activities could have been discovered years earlier.

Under Indiana's discovery rule, a cause of action accrues, and the statute of limitation begins to run, when a claimant knows or in the exercise of ordinary diligence should have known of the injury. *Pflanz v. Foster*, 888 N.E.2d 756 (Ind. 2008). The party pleading a statute of limitation bears the burden of proving the suit was commenced beyond the statutory time allowed. *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274 (Ind. 2009). Once the party makes a prima facie case, the burden shifts to

4

the other party to prove such facts as will prevent the running of the statute. *Arnold v. Dirrim*, 398 N.E.2d 426 (Ind. Ct. App. 1979). Nevertheless, the ultimate burden of persuasion remains on the party asserting the bar. *Id.* Determining when a cause of action accrues is generally a question of law. *Cooper Indus.*, 899 N.E.2d at 1280. However, where, as here, application of a statute of limitation rests on questions of fact, it is an issue for the finder of fact to decide. *Id.* at 1279.

The parties agree that Wabash had six years from the date of injury, or the discovery of the injury in the exercise of ordinary diligence, to file suit against Landers. Ind. Code § 34-11-2-7 (1998). Some or all of McAninch's fraudulent transactions that resulted in funds being transferred to Landers did occur outside the six-year statute of limitation. Nevertheless, the trial court concluded that Wabash acted with ordinary diligence in managing its finances and in determining the whereabouts of its funds once it became aware of McAninch's scheme.

There is sufficient evidence to support the trial court's conclusion. As noted above, McAninch implemented an elaborate procedure to divert Wabash's funds. This included false invoices and false minutes, kept in a locked drawer in his office, and a bank account in a fictitious company's name. As the director of Wabash's business office, he directed the people whose jobs it was to implement Wabash's financial management procedures and process S & S's fraudulent requests for payment.

As McAninch's scheme progressed, Wabash's finance committee met regularly to review financial reports and to approve financial statements that were provided to the full

5

board of directors.  McAninch was responsible for providing reports to the committee and preparing the committee minutes and financial statements for submission to the board of directors, and there was no apparent reason to question McAninch's reports or suspect that he had created false minutes.

In addition, at Wabash's direction McAninch had created the financial manual that governed Wabash's accounting procedures.  The board of directors and executive director regularly reviewed and updated the manual over the course of McAninch's employment.  There appears little contest that these procedures were appropriate.  The contest is whether Wabash should have discovered they were not being followed.

Finally, Wabash hired an outside auditor to review Wabash's books each year and submit a report to the Indiana State Board of Accounts.  The auditor reviewed Wabash's financial policies and procedures and examined Wabash's documents to determine whether policies and procedures were being followed.  Jeffrey Darling, Wabash's executive director from 1990 through 2010, limited his interaction with the auditor because he felt it would be inappropriate for him to appear to direct her work, and the auditor concurred with his approach.  Consequently, McAninch was the auditor's main point of contact, and year after year McAninch supplied the auditor with false minutes and fake invoices from S & S, among the other financial documents the auditor reviewed.  The auditor filed annual reports with the State Board of Accounts, and the Board never questioned the reports or launched its own investigation.

6

After McAninch committed suicide, Darling asked the auditor whether Wabash should obtain an outside analysis of Wabash's financial management procedures. The auditor told Darling "[Wabash] really didn't need to waste [its] money, that [its] internal control processes were strong relative to what she had seen in other organizations similar to [Wabash] and that if someone was going to steal money from you they would find a way." Tr. p. 110.

This evidence of McAninch's elaborate scheme and Wabash's consistent monitoring of its financial procedures adequately supports the trial court's conclusion that Wabash acted with ordinary diligence in managing its finances and could not have reasonably been expected to discover McAninch's theft prior to his suicide. Within a few months after McAninch's suicide in October 2009, the forensic accounting firm hired to determine the scope of the theft and determine what McAninch did with the money submitted a report that concluded, "[F]unds were used by McAninch to pay for personal purchases, pay personal debt, purchase a new home, and provide funds to family members including . . . Connie Landers." Appellant's App. p. 239. Wabash filed suit against Landers in 2011, well within six years of the date Wabash discovered McAninch's theft and transfer of funds to Landers.[1]

---

[1] This conclusion obviates the need to address a different point raised by Wabash—whether the statute of limitation ran as to Landers only when there was reason to know she possessed assets stolen from Wabash.

7

We find no clear error in the trial court's conclusion that the statute of limitation did not bar Wabash's suit.[2]

## II. Unjust Enrichment

To prevail on a claim of unjust enrichment, a plaintiff must establish that a measurable benefit has been conferred on the defendant under circumstances in which the defendant's retention of the benefit without payment would be unjust. *Encore Hotels of Columbus, LLC v. Preferred Fire Prot.*, 765 N.E.2d 658 (Ind. Ct. App. 2002). Principles of equity prohibit unjust enrichment in cases where a party accepts the unrequested benefits provided by another despite having the opportunity to decline those benefits. *Olsson v. Moore*, 590 N.E.2d 160 (Ind. Ct. App. 1992), *trans. denied*.

Here, the trial court determined that Wabash was entitled "to a constructive trust and/or an equitable lien" in the amount of $836,685 plus prejudgment interest, which represented funds stolen by McAninch from Wabash during the marriage and payments McAninch gave Landers pursuant to their divorce agreement. Appellant's App. p. 33.

---

[2] As with the issue mentioned in footnote 1, our conclusion concerning the trial court's finding about discovery with reasonable diligence likewise makes it unnecessary to determine whether the statute of limitation was tolled by Landers' own fraudulent concealment. During the marriage, Landers knew McAninch was bringing in additional income through "moonlighting." Tr. p. 66. During divorce negotiations in 1998, Landers told McAninch, "I am . . . giving you advance warning of what to come, if you refuse to settle this my way. . . . You will be totally destroyed if this community finds out what you have been up to." Appellee's App. p. 4. She further stated that if the divorce was not resolved on her terms, "I will be completely truthful to family, friends, your employer, the court and the community with any and all information that I currently have concerning your personal integrity. I hope you realize you have a lot at stake and potentially have a lot more to lose." *Id.* at 6. McAninch told Landers, "If we can't make [the settlement] work between the two of us, we will all lose out in the end. We both have a lot to lose." *Id.* at 1. He also stated, "If . . . you carry out your vengeance, everyone loses in the end." *Id.* at 2. The trial court characterized Landers' subsequent receipt of virtually the entire marital estate in the divorce settlement as "hush money." Appellant's App. p. 30.

Landers argues that there is insufficient evidence to support the trial court's conclusion that she received funds that McAninch had stolen from Wabash. Specifically, she says there is no evidence that she benefitted from the stolen funds during the marriage. Furthermore, she says McAninch could have used lawfully-earned money to cover all of his payments and transfers to her pursuant to the divorce decree, and Wabash failed to prove that he paid her with stolen money.

During the marriage, Landers and McAninch jointly managed their checking account. Landers acknowledged seeing checks McAninch received for "moonlighting income." Tr. p. 66. Those checks were deposited in their joint account. During Landers and McAninch's divorce negotiations, she estimated his income at "approximately $150,000.00 per year," thereby indicating she was well aware that he had provided the family with money above and beyond his Wabash salary. Thus, there is evidence to support the trial court's conclusion that Landers benefitted from funds McAninch had stolen from Wabash during the marriage. *See Paul v. I.S.I. Servs.*, 726 N.E.2d 318, 322 (Ind. Ct. App. 2000) (sufficient evidence of unjust enrichment of a spouse where the spouse's husband deposited embezzled funds in their joint brokerage account and the funds were used for house and car payments).

Turning to the divorce and Landers' claim that McAninch could have paid her with lawfully-obtained funds, we find guidance in *Hicks v. State*, 635 N.E.2d 1151 (Ind. Ct. App. 1994), *trans. denied*. Joseph Hicks robbed three banks, and the State determined that some of the funds were deposited in bank accounts Joseph held jointly

9

with his wife Jane. Other funds were found in a file cabinet in the marital home. The State sought to recover those funds, and Jane argued that the money in the bank accounts did not come from the robberies. The court cited a long-standing rule that where ill-gotten gains are commingled with other funds and the thief draws upon the commingled funds, the thief is presumed to draw out his own money first, and the remainder belongs to the source of the ill-gotten gains. *Id.* at 1156 (quoting *Winstandley v. Second Nat. Bank of Louisville*, 13 Ind. App. 544, 41 N.E. 956, 957-58 (1895)). Consequently, the court concluded that Joseph's withdrawals from the accounts after the robberies but before the State's lawsuit involved the Hicks' own funds, and what was left in the bank accounts came from the stolen funds.

In this case, when the parties separated in 1998, McAninch "started buying lots of personal toys for himself." Tr. p. 39. He spent "nearly $40,000" on a boat and accessories. Appellee's App. p. 3. He also bought a new vehicle, a "Suburban." Tr. p. 37.

Subsequently, the parties negotiated a divorce agreement through which Landers retained the house, which was valued at the time of trial at $391,000, and a vehicle. In addition, McAninch agreed to pay Landers $20,000, to be followed by monthly payments of $3250 for sixty months (intended in part to pay the mortgage and in part to support Landers). McAninch further agreed to transfer $30,000 of his pension to Landers. He also took total responsibility for their son's college expenses and "assumed [Landers'] responsibility for twenty percent" of his stepson's college costs. *Id.* at 61. McAninch

10

further agreed to pay child support for their son in a monthly amount well above what the Indiana Child Support Guidelines would require for McAninch's reported income from Wabash. Finally, McAninch agreed to pay any of Landers' educational expenses for seeking a master's degree and a doctoral degree.

McAninch's salary from Wabash in 1998 was $71,713, and it is difficult to conclude that he could have afforded to pay Landers $20,000 at the time the divorce agreement was approved, plus begin monthly child support and spousal maintenance payments, using only his legitimate Wabash income. Similarly, McAninch's subsequent spousal maintenance and child support obligations were quite large in comparison with his legitimate income from Wabash.

Based upon this evidence, the rule set forth in *Hicks* applies, and the trial court appropriately determined that the funds McAninch paid to Landers pursuant to the divorce decree, including equity in the home, were stolen from Wabash because McAninch had already spent his own legitimately-earned money on a boat, a vehicle, and other expenditures. Landers' argument that McAninch paid her from a legitimate source of income is a request to reweigh the evidence.

CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

KIRSCH, J., and BRADFORD, J., concur.

11