John D. MARKS, Plaintiff–Appellant,

v.

CDW COMPUTER CENTERS, INC., a Delaware corporation, f/k/a MPK Computing, Inc., and Michael P. Krasny, Defendants–Appellees.

No. 96–2693.

United States Court of Appeals,
Seventh Circuit.

Argued May 14, 1997.

Decided July 28, 1997.

Lawrence R. Levin, Vance L. Liebman (argued), Damon E. Dunn, James F. Groth, Jeffrey E. Kopiwoda, Levin & Funkhouser, Chicago, IL, for Plaintiff–Appellant.

Dan K. Webb, Scott J. Szala (argued), Christopher M. Nolan, Winston & Strawn, David Rallo, Rallo & Tepper, Allan T. Slagel, Patricia Susan Spratt, James D. Wilson, Shefsky, Froelich & Devine, Chicago, IL, for Defendants–Appellees.

Before CUMMINGS, COFFEY and DIANE P. WOOD, Circuit Judges.

CUMMINGS, Circuit Judge.

On June 10, 1993, plaintiff-appellant John D. Marks ("Marks") filed a complaint (the "Original Complaint") in this matter against defendants-appellees Michael P. Krasny ("Krasny") and CDW Computer Centers, Inc. ("CDW"), in the Northern District of Illinois, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, as well as state law fraud and breach of fiduciary duty claims. The district court dismissed the Original Complaint with leave to replead on September 22, 1995, finding that Marks was on inquiry notice of his securities law claim by July 27, 1990, and thus was barred by the applicable one-year statute of limitations. Marks filed an amended complaint (the "Amended Complaint") on October 30, 1995, stating the same violations of law by CDW, and on June 14, 1996, the district court again dismissed the Amended Complaint, this time with prejudice, on the basis of its conclusion that Marks's securities fraud claims were barred by the statute of limitations.

Marks appeals the district court's dismissal of the Amended Complaint.

**Facts**

The facts as set forth in the Amended Complaint are as follows: Krasny founded CDW in 1984 to engage in direct marketing and retail sales of microcomputer products. In September 1985, Krasny hired Marks as a salesperson, and in that position Marks performed well, so that approximately three months after Marks had begun working for CDW, Krasny promoted Marks to sales manager and head of purchasing. At that time, Krasny offered to give Marks an equity position in CDW at some point in the future in exchange for a reduced compensation in his new position. (Amended Complaint, ¶¶ 6–9.)

CDW's sales and profitability grew rapidly in the following years, and in early 1988, Krasny and Marks signed a Stock Purchase Agreement under which Marks purchased a 20% equity interest in CDW for $124,980 in cash and a promissory note in the amount of $42,100. At the same time, Marks, Krasny and CDW entered into a Stockholder Agreement (the "Stockholder Agreement"), which included a provision granting to CDW and Krasny options to purchase Marks's shares upon termination of Marks's employment with CDW. The options were exercisable within 60 days following Marks's termination date. (Amended Complaint, ¶¶ 11, 14 and 15.)

At all times relevant to this case, Krasny was the sole shareholder of Northbrook Ad Agency, Inc. ("NAA"), which Krasny formed in 1984. Krasny told Marks that NAA had been formed for the purpose of obtaining the commissions available to advertising agencies on advertising placements. Substantially all funds expended by CDW for advertising placements and all commissions received as a result of such placements were channeled through NAA. (Amended Complaint, ¶ 13.)

During 1988, Krasny retained a subsidiary of First Chicago Corporation ("First Chicago") to advise him in connection with a possible sale of CDW. First Chicago evaluated CDW and provided Krasny with an opinion of the market value of CDW, which was concealed from Marks. CDW did not retain any written record of the First Chicago opinion. In addition, First Chicago obtained an offer to purchase CDW pursuant to which the payments to Krasny and Marks, as the sole shareholders of CDW, would total over $12,000,000. Krasny concealed the details of the offer from Marks, and he told Marks that the offer was for only $8,000,000. In late November 1988, Krasny called off the pending sale of the business, misrepresenting to Marks that the potential buyers did not have the financial backing to complete the transaction. Krasny did not disclose to Marks that it was actually Krasny who called off the deal or that his reason for doing so was that he had decided to increase the value of CDW by developing a professional management team that would not include Marks. CDW did not retain any written record of the reasons the transaction had been canceled. (Amended Complaint, ¶¶ 18–21.)

During 1989 and 1990, Krasny bit by bit relieved Marks of essentially all of his managerial duties, culminating in a letter from Krasny to Marks on or about May 15, 1990, notifying Marks that his employment with CDW was terminated, for cause, effective immediately. (Amended Complaint, ¶¶ 22–24 and 26.) Marks alleges in the Amended Complaint that Krasny caused CDW to (i) terminate Marks for cause in order to eliminate the rights that Marks would otherwise have to compel CDW to purchase Marks's shares, and (ii) refuse to exercise its option to purchase those shares under the Stockholder Agreement in order that CDW would not have to pay Marks the price for the shares required under the Stockholder Agreement. (Amended Complaint, ¶ 32.)

During March 1990, Krasny proposed payment to himself of a very substantial bonus, which would have increased his compensation significantly from that received in prior years. Krasny introduced a resolution to the Board of Directors of CDW to ratify and approve the bonus, and Marks, as a director of CDW, voted against it in June 1990. (Amended Complaint, ¶ 27.)

Also in March 1990, Marks and Krasny had begun negotiations for the purchase of Marks's CDW shares. In preparation for that purchase, Marks specifically asked

Krasny for information regarding the value and income of NAA, and Krasny refused to permit Marks to examine the books and records of NAA. Krasny told Marks in a telephone conversation that Summer that NAA made almost no profit and that any such profits had been reinvested in CDW or spent by NAA for CDW's benefit. Marks claims that the veracity of this information could not be confirmed through a review of the books and records of CDW or any other information available to Marks prior to March 1993. (Amended Complaint, ¶¶ 25 and 28.)

Prior to the consummation of Marks's sale of his CDW shares, Marks was permitted to perform a due diligence review of CDW's books and records. Marks asserts that such investigation did not reveal, and could not have revealed, the various misrepresentations and omissions by Krasny and CDW that form the basis of his lawsuit. (Amended Complaint, ¶ 29.)

In July 1990, Marks and CDW executed a Stock Purchase Agreement (the "Buyout Agreement"), whereby Marks agreed to sell to CDW all of his CDW shares for a total purchase price of $470,028. That amount was purported to represent an amount less than the book value of Marks's 20% interest in CDW. As a condition to the purchase of Marks's shares, Marks was required to approve the compensation resolution he had voted against in June 1990. (Amended Complaint, ¶¶ 30–31.) After execution of the Buyout Agreement, CDW was obligated to provide Marks with CDW financial information for calendar year 1990 for tax purposes, and CDW provided that information to Marks in the first quarter of 1991. Marks claims that CDW and Krasny "took actions" in connection with that information that continued to conceal from Marks certain material information that had been misrepresented or omitted by CDW and Krasny in connection with the Buyout Agreement. (Amended Complaint, ¶ 34.)

On March 19, 1993, CDW filed a registration statement with the Securities and Exchange Commission, which proposed an initial public offering of CDW common stock to the public. The Amended Complaint alleges that certain information in the registration statement put Marks on notice for the first time that the representations made by Krasny to Marks prior to execution of the Buyout Agreement regarding the value and profitability of NAA and the use of the profits of NAA were untrue. (Amended Complaint, ¶¶ 35–37.) In his brief before this Court, Marks claims that he became aware of the First Chicago valuation and the value of and circumstances surrounding the failed 1988 offer to purchase CDW—which are the other claimed material misrepresentations or omissions in this action—during discovery in this action and that he could not have become aware of such events prior to that time. (Applt. Br. at 17.)

The district court found that Marks was on inquiry notice by July 1990, the time the Buyout Agreement was executed, concluding that a review of CDW's books would have revealed Krasny's misrepresentations regarding NAA and placed Marks on inquiry notice. It found "conclusory and unresponsive" Marks's assertion in the Amended Complaint that such an investigation could not have revealed the alleged misrepresentations and omissions. *Marks v. CDW Computer Centers, Inc.*, Memorandum Opinion of the District Court at 6, 1996 WL 341374 (N.D. Ill. June 14, 1996) [*hereinafter* "Memorandum Opinion"]. The court determined that "[i]f NAA had transferred its profits to CDW, as Krasny allegedly stated, then such an agreement would have been a corporate asset that would have appeared somewhere in CDW's corporate records." *Id.* at 7. The fact that no such agreement appeared on the books would have put a reasonable person on notice of the need to conduct a further inquiry. In addition, the district court found that certain "storm warnings"-such as Krasny's attempt to dramatically increase his compensation, his refusal to reveal certain information to Marks, the abrupt termination of Marks, and the coerciveness of the 1990 sale of the shares—should have alerted Marks to the fact that he needed to investigate further. *Id.* at 8.

**Standard of Review**

This Court reviews the district court's decision to dismiss the Amended Complaint pursuant to Fed. R. Civ. P.

12(b)(6) *de novo*, accepting all of Marks's factual allegations in the Amended Complaint as true and drawing all reasonable inferences in Marks's favor. See *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir.1995). We will not dismiss a complaint for failure to state a claim unless we are sure, beyond a doubt, that the plaintiff cannot prove any set of facts that would entitle him to relief. See *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir.1997). Whether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under S.E.C. Rule 10b–5 is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6). See, *e.g., Tomera v. Galt*, 511 F.2d 504, 510–511 (7th Cir.1975), overruled on other grounds by *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385 (7th Cir.1990).

## Discussion

An action claiming a violation of Rule 10b–5 must be filed "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321. This Court has held that "discovery" may be imputed to a plaintiff when he is put on "inquiry notice"—i.e., when he becomes "aware of facts that would have led a reasonable person to investigate whether he might have a claim"—of his claims under Rule 10b–5. See *Tregenza v. Great American Communications Co.*, 12 F.3d 717, 718, 722 (7th Cir.1993), certiorari denied, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465. Therefore, if we find, as the district court did, that Marks was on inquiry notice at the time he entered into the Buyout Agreement with CDW, we must dismiss his claim as untimely, given that it was filed almost three years after the date of the Buyout Agreement. Likewise, if we agree with Marks that he was not put on notice until CDW filed its registration statement with the Securities and Exchange Commission, then Marks's complaint was timely.

Marks's argument on appeal boils down to a claim that the district court erred in granting CDW's motion to dismiss because it improperly drew inferences against him and disregarded the allegations of the Amended Complaint when it found that (i) Marks had information sufficient at the time of the negotiations surrounding the Buyout Agreement to put a reasonable person on notice of potential fraudulent activity and (ii) an investigation by Marks at that time would have revealed facts constituting a violation. Marks contends that the district court improperly based its decision on inferences of hostile relations or "bad blood" between the parties. We agree.

This Court's recent opinions in *Law v. Medco Research, Inc.*, 113 F.3d 781 (7th Cir.1997), and *Fujisawa Pharmaceutical Company, Ltd. v. Kapoor*, 115 F.3d 1332 (7th Cir.1997), are instructive on the pertinent issues in this case. *Law* answered the following question: "[W]hat exactly [is it] that the investors must discover (or should have discovered) to start the statute of limitations running"? 113 F.3d at 785. This Court held that the statute of limitations begins to run at the point an investor has "learned or should have learned the facts that he must know to know that he has a claim." *Id.* We believe that implicit in that formulation is the requirement that not only must the investor be on notice of the need to conduct further inquiry, but the investor also must be able to learn the facts underlying the claim with the exercise of reasonable diligence. Cf. *Tregenza*, 12 F.3d at 720–721; *Norris v. Wirtz*, 818 F.2d 1329, 1334 (7th Cir.1987) ("[T]he time to file suit begins to run when the investor either knows or in the exercise of reasonable diligence could have discovered the facts on which the suit is based. . . . The question is . . . whether diligence would have paid off.") (emphasis added), overruled on other grounds by *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385. This Court noted in *Law* that "[s]uspicious circumstances, coupled with ease of discovering, without the use of legal process, whether the suspicion is well grounded, may cause the statute of limitations to start to run before the plaintiffs discover the actual fraud." 113 F.3d at 786. But in that case, this Court found that the defendants had not shown what the investors could have done prior to the time the suit

was filed to obtain the necessary facts. Therefore, it found that the defendants had failed to show that a reasonably diligent investor would have brought suit prior to the time it had been filed. *Id.*[1]

*Fujisawa* further supports our determination that inquiry notice does not begin to run unless and until the investor is able, with the exercise of reasonable diligence (whether or not actually exercised), to ascertain the information needed to file suit. In that case, this Court found that:

> The facts constituting [inquiry] notice must be sufficiently probative of fraud—sufficiently advanced beyond the stage of a mere suspicion, sufficiently confirmed or substantiated—not only to incite the victim to investigate but also to enable him to tie up any loose ends and complete the investigation in time to file a timely suit.

115 F.3d at 1335. Both parties to that action apparently agreed that, at the very least, for inquiry notice to begin to run, the investor must have access to the facts that would show fraud; they disagreed only over whether the victim must have all of the facts in order to bring suit immediately or whether simple access to facts that would show fraud is enough. *Id.* at 1334–1335. This Court found that in determining the amount of suspicion or proof necessary to start the statute of limitations running what is important is "how easy it is to obtain the necessary proof by a diligent investigation aimed at confirming or dispelling the suspicion." *Id.* at 1335.

■ The district court in this case agreed that "[a] court must consider not whether an investor actually exercised diligence, but whether diligence would have paid off," Memorandum Opinion at 6, but it nevertheless found that a review of CDW's books would have revealed Krasny's misrepresentations regarding the use of NAA's profits, *id.* at 7–8. However, the allegation in the Amended Complaint was that Krasny told Marks that NAA made almost no profit and that any profits were reinvested in CDW or spent by NAA for CDW's benefit. If the profits were nonexistent, the absence of a confirming entry in CDW's books and records would clearly not be alarming; it would be logical. More importantly, if NAA's profits were spent by NAA for CDW's benefit, CDW's books would not necessarily include those expenditures. In sum, the district court could only reach its conclusion by improperly drawing inferences against Marks and in favor of CDW.[2]

The district court's other bases for finding inquiry notice were also improper and required the district court to impermissibly draw inferences in the Amended Complaint against Marks. Assuming that "bad blood" or "storm warnings" like those the district court listed—the disagreement over Krasny's attempt to increase his compensation, Krasny's refusal to reveal information to Marks, Marks's termination, and the coercive nature of the transaction covered by the Buyout Agreement—could be sufficient to place someone on inquiry notice, we believe it is abundantly clear that such a question would be one for the trier of fact in this case. Except in the most extreme circumstances, and we find that the facts in this case are not

---

1. Defendant makes use of a footnote in this Court's opinion in *Whirlpool Financial Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 610 n. 3 (7th Cir.1995), to argue that an investor's inability to ascertain the facts underlying a securities fraud claim should not stop the statute of limitations from beginning to run. However, that footnote disposed of the plaintiff's equitable tolling argument rather than addressing an inquiry notice argument, concluding that "the one-year statute of limitations was not subject to equitable tolling." *Id.* In any event, the Court very specifically noted in the main portion of its opinion that contradictory information—dramatic discrepancies between precise projections made and actual results and other information in the public domain—was readily available to the investor in that case and put the investor on notice of fraud. *Id.* at 610.

2. The district court also erred when it dismissed as "conclusory" Marks's allegation that an investigation of CDW's books "could not have" revealed Krasny's misrepresentations regarding NAA, in effect requiring Marks to affirmatively plead specific facts showing that there was no information in CDW's books and records from which Marks could have discovered the fraud. This would have required Marks to somehow "prove a negative" in his complaint, a nonsensical result.

even close to extreme,[3] the trier of fact should determine when, and under what circumstances, such relations would be sufficiently adversarial to trigger the running of the statute of limitations, keeping in mind that the relationship between a buyer and seller of a security is an inherently adversarial one. See *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir. 1984), certiorari denied, 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265; *Tomera,* 511 F.2d at 510–511. Rational acting parties to a commercial transaction always use their bargaining strength to secure the best deal possible for themselves; that action, alone, does not put a reasonable person on inquiry notice of the existence of fraud. Similarly, people have acrimonious relationships all the time without putting one party on inquiry notice. The district court improperly substituted its own conclusions for facts. In any event, none of these "storm warnings" address the fundamental flaw in CDW's argument: What facts, sufficiently particular to file a claim, could Marks have found even if he had started looking at that time? How could he have confirmed or dispelled any suspicions with the materials available to him? Would CDW have had Marks risk Rule 11 sanctions or a violation of Rule 9(b) by filing a complaint listing the "bad blood" or "storm warnings" and no other particularized evidence of fraud?

■ We can quickly dispose of CDW's other bases for arguing for the dismissal of the Amended Complaint. CDW maintains that Marks "knew" the potential market value of his shares in 1988 was approximately $1.6 million (20 percent of $8 million), because he was aware of an $8 million offer received from an independent third party that year. Therefore, the argument goes, he should have been on notice of some kind of problem when he received less than one third of that amount for his shares in 1990. First, it is important to note that Marks was told that the $8 million deal was not completed because the buyer could not obtain the

requisite financing; he logically could have inferred from that fact that perhaps the company was not worth the full $8 million. Even more importantly, this argument fundamentally ignores the universally understood economic truism that the value of a minority shareholder position in a closely held company, when being sold by itself, is almost always a great deal less than the value one could receive by selling all of the shares or a majority of the shares of a company. That Marks was willing to sell his CDW shares with the knowledge that a prior offer to purchase CDW for $8 million could not be financed does not mean that Marks would be willing to sell his shares for a like amount had he thought that the purchase offer actually was for over $12 million and had been rejected by Krasny as too low.

■ CDW lastly argues that, even if we find that Marks's complaint was timely filed, we should dismiss the Amended Complaint because the purported misrepresentations or omissions were not material and could not have caused Marks's alleged damages as a matter of law. In particular, it maintains that by proceeding with the transaction after he was denied access to NAA's books and records, Marks is precluded from relying on any alleged misrepresentation concerning NAA as the basis for a Rule 10b–5 claim. If he decided to close the deal without receipt of the requested information and if there was no representation or warranty in the Buyout Agreement covering NAA, it logically must be that the requested information was immaterial to his investment decision. CDW also argues, in a rehash of an argument disposed of earlier in this opinion, that regardless of whether the 1988 offer to buy CDW was for $8 million or for $12 million, why the transaction was not completed or whether the alleged First Chicago opinion was disclosed, Marks was determined to sell his interest for an amount unrelated to the market value of CDW. Therefore, none of those alleged misstatements or omissions could be material,

---

**3.** For example, defendant makes much of the fact that Krasny refused to allow Marks to review the NAA books and records, arguing that it somehow should have put Krasny on inquiry notice of fraud. But we do not agree. Marks had no legal right to see the books of a corporation in which he held no equity interest, and Krasny's decision not to share the information does not strike this Court as something Marks should have found particularly notable, let alone evidence of fraud.

given that Marks knew that his 20 percent interest could have been worth three times what he received (i.e., 20 percent of the $8 million offer of which he was aware). Lastly, CDW asserts that Marks cannot show a reasonable reliance on the purported misstatements and omissions because of the parties' adversarial relationship.

The problem with CDW's materiality arguments is that "[t]he determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact;" thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss. See *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976); *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1235–1236 (7th Cir.1988). Perhaps CDW would prevail with this argument at trial, although we believe that in this Court they have treated the allegations in the Amended Complaint rather loosely, asking us to draw inferences adversely to Marks, which we cannot do on a Rule 12(b)(6) motion. However, especially when we are faced with a motion for dismissal of the Amended Complaint, in which Marks maintains that the alleged misrepresentations and omissions were, in fact, material, we cannot say at this point that they were not material as a matter of law. The same is true of CDW's reliance argument. See *Rowe,* 850 F.2d at 1234.

As noted above, a defendant attempting to dismiss a plaintiff's claim on a Rule 12(b)(6) motion in this context must clear a high hurdle. When we take all of Marks's factual allegations in the Amended Complaint as true and draw all reasonable inferences in Marks's favor, as we must, we think it clear that defendants have not shown as a matter of law that a reasonably diligent investor would have brought suit prior to the time it was actually filed in this case. To hold otherwise would require Marks to have filed a premature and potentially groundless suit prior to the time he could have obtained

"good evidence of fraud." *Law,* 113 F.3d at 786.

In light of the foregoing, the decision of the district court is REVERSED.