THE LINCOLN NATIONAL LIFE IN-SURANCE COMPANY and Lincoln Investment Management, Inc., on behalf of Lincoln National Income Fund, Plaintiffs,

v.

DONALDSON, LUFKIN & JENRETTE SECURITIES CORPORATION, Defendant.

No. 1:97–CV–429.

United States District Court, N.D. Indiana, Fort Wayne Division.

May 20, 1998.

---

Mark A. Garvin, Barnes and Thornburg, Fort Wayne, IN, Robert P. Johnstone, Howard E. Kochell, Anne N. DePrez, Barnes and Thornburg, Indianapolis, IN, for Plaintiffs.

James H. Ham, III, Robert K. Stanley, Baker and Daniels, Indianapolis, IN, Douglas D. Powers, Baker and Daniels, Fort Wayne, IN, Thomas P. Ogden, Eric F. Grossman, Davis Polk & Wardell, New York City, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the court for resolution of a Motion to Dismiss filed by the Defendant, Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ") on January 23, 1998.[1] Plaintiffs The Lincoln National Life Insurance Company and Lincoln Investment Management, Inc., ("Lincoln Life" and "Lincoln Investment" or "Plaintiffs") filed a

---

1. DLJ also filed, on March 27, 1998, a Motion to Stay Discovery pending this court's ruling on the Motion to Dismiss. Plaintiffs filed an objection to the Motion to Stay. The Motion to Stay was discussed at oral argument. The court informed the parties that if the Motion to Dismiss was denied a conference would be scheduled with Magistrate Judge Roger B. Cosbey, at which a revised discovery schedule would be established. The District Clerk will notify the parties of the date and time of that conference.

response in opposition to the motion on February 13, 1998, and DLJ filed a reply on February 25, 1998. Also on February 25, DLJ filed a Motion for Oral Argument. The court held oral argument on April 14, 1998. For the following reasons, the Motion to Dismiss is **DENIED**.

## STATEMENT OF FACTS

Lincoln National Income Fund is a closed-end mutual fund. Lincoln National is a life insurance company headquartered in Fort Wayne, Indiana. Lincoln Investment is an investment advisor that advises various companies, including Lincoln Life and the Lincoln Fund, on investment matters. DLJ is a securities brokerage company with its principal place of business in New York, New York. Lincoln Life and Lincoln Investment brought this action under Indiana law, claiming that DLJ made material misrepresentations when it sold over $40 million in certain investments to the Plaintiffs. Plaintiffs allege that DLJ violated the Indiana Securities Act, I.C. § 23–2–1–1 et seq. In the alternative, Plaintiffs claim they are entitled to an equitable remedy of rescission of the purchase contract based on mutual mistake.

The investments involved an instrument known as a mortgage-backed security. The instruments in this case are known as Trust Certificates, Series 1995–QT4 (the "QT4 Certificates"). These trust certificates represent ownership interests in a trust holding 35 other trust certificates. The certificates do not represent an investment in an ongoing business, but rather are rights to the cash flows generated by one or more underlying pools of mortgage loans. DLJ states that "[u]nlike a typical note or bond, a mortgage-backed security does not have a stated term, nor a set yield to maturity. Instead, the amount and timing of payments on the securities are constantly subject to change depending on rates of prepayment and delinquency, and realization of losses on the underlying mortgage loans." Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint ("Defendant's Memorandum"), p. 1. The 35 trust certificates in turn represent subordinated interests in 13 trusts holding more than 14,000 mortgage loans with a principal balance of over $1.18 billion. In May of 1995 DLJ offered the QT4 Certificates to institutional investors[2] through a Private Placement Memorandum (the "PPM"). The PPM is a 69–page prospectus setting forth detailed information concerning the certificates.[3] The PPM also notes that Lomas Mortgage USA, Inc. ("Lomas") was the company responsible for servicing the loans underlying the QT4 Certificates.

On January 25, 1996, Lincoln Life and the Lincoln National Income Fund, acting through Lincoln Investment, purchased $11 million of the QT4 Certificates. On February 13, 1996, Lincoln Life purchased an additional $30 million of the certificates. The Plaintiffs claim that DLJ made material misrepresentations regarding the delinquency rates and REOs for the underlying mortgage loans for November of 1995.[4] These statistics were first reported to Lincoln Life and Lincoln Investment in December 1995. As for Plaintiffs' mutual mistake claim, they allege that DLJ's decision to sell, as well as the Plaintiffs' decision to purchase, the QT4 Certificates were based on the inaccurate statistics regarding the mortgage pools underlying the certificates. Plaintiffs brought this action seeking compensatory damages in the amount of the purchase price of the investments plus interest at 8%, less any cash received on the certificates. In the alternative, Plaintiffs seek rescission of the pur-

2. As DLJ states in its Memorandum, "[i]n order to qualify as a 'qualified institutional buyer' under the SEC's private placement rules, all potential investors were required to own or invest on a discretionary basis at least $100 million in securities." Defendant's Memorandum, p. 2, n. 2 (citing 17 C.F.R. § 230.144A (1997)).

3. As discussed later in this Order, the PPM is itself the subject of argument in this case. Plaintiffs contend that the PPM should not be considered by the court in deciding the present Motion to Dismiss.

4. "REO" is an acronym for "real estate owned." As DLJ explains, "[t]he REO rate for a given mortgage pool represents the percentage of loans that have been extinguished through foreclosure and acquisition of underlying properties by the pool trust." Defendant's Memorandum, p. 5, n. 4. .

chases based on their theory of mutual mistake, together with prejudgment interest.

## STANDARD OF REVIEW

A motion to dismiss challenges the sufficiency of the plaintiff's complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). "When a federal court reviews the sufficiency of a complaint ... its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "A complaint ... should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In determining the propriety of dismissal under Fed.R.Civ.P. 12(b)(6), the court "must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences therefrom in favor of the plaintiff." *Perkins v. Silverstein,* 939 F.2d 463 (7th Cir.1991). *See also Gomez v. Illinois State Bd. of Education,* 811 F.2d 1030, 1032–33 (7th Cir.1987). The purpose of the motion to dismiss is to test the legal sufficiency of the complaint and not to decide the merits. *Triad Assoc., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989). "If it appears beyond doubt that plaintiff can prove any set of facts consistent with the allegations in the complaint which would entitled them to relief, dismissal is inappropriate." *Perkins,* 939 F.2d at 466. Further, the court must "construe pleadings liberally, and mere vagueness or lack of detail does not constitute sufficient grounds for a motion to dismiss." *Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985).

## DISCUSSION

**1. Consideration of Private Placement Memorandum.**

DLJ claims in its Motion to Dismiss that Plaintiffs fail to state a claim under the Indiana Securities Act, fail to state a claim for mutual mistake, and fail to meet the particularity requirement of Fed.R.Civ.P. 9(b). As a preliminary matter, the Plaintiffs argued in their response brief that the PPM is a document that is outside the pleadings and therefore should not be considered with respect to the present motion. DLJ argued that "[a]s the principal disclosure document for the securities at issue in this case, the PPM is central to plaintiffs' claims and may be deemed incorporated by reference in the complaint for purposes of this motion to dismiss." Defendant's Memorandum, p. 1, n. 1. DLJ cites several cases which it contends support this argument, including, *inter alia, In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410 (3d Cir.1997). In *Burlington,* the Third Circuit explained that "[a]s a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.... However, an exception to the general rule is that a 'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion to dismiss into one for summary judgment.'" *Burlington,* 114 F.3d at 1426 (citations omitted) (italics in original). The court held that it was not improper in that case for the district court to consider a corporation's annual report even though the report was not specifically mentioned in the plaintiffs' complaint. The court explained that "what is critical is whether the claims in the complaint are 'based' on an extrinsic document and not merely whether the extrinsic document was explicitly cited.... Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.* DLJ also cited the case of *The Steinhardt Group, Inc. v. Citicorp,* 1996 WL 790097 (D.Del. Dec. 2, 1996), *aff'd,* 126 F.3d 144 (3d Cir.1997), wherein the district court held that it would consider documents not specifically cited in plaintiffs' complaint and "not 'permit[ ] ... plaintiff[s] to evade a properly argued motion to dismiss simply because plaintiff[s] ha[ve] chosen not to attach the [documents] to the complaint or incorporate [them] by reference.'" *Steinhardt,* 1996 WL 790097 * 2, n. 1 (D.Del. Dec. 2, 1996) (alterations in original). DLJ cited other cases in support of its argument that the PPM is properly before the court. In *Romani v. Shearson Lehman Hutton,* 929 F.2d 875 (1st

Cir.1991), the defendants in a securities fraud case attached to their motion to dismiss a copy of the prospectus that had been prepared for the investment that formed the basis of the lawsuit. The plaintiff had not attached a copy of the offering materials to the complaint. Nonetheless, the First Circuit held that it was proper for defendants to attach the offering materials as an exhibit. The court explained:

> Although plaintiff did not attach a copy of the offering materials to his complaint, defendants submitted the documents with their motions to dismiss. This step was proper and did not convert the motion to dismiss into a motion for summary judgment. *See Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir.1988) (" 'when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading" ') (quoting 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1327 at 762–63 (1990[sic] )).

*Romani*, 929 F.2d at 879, n. 3. DLJ also cited *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993), which held that a court in resolving a motion to dismiss may consider, among other things, "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Based on these cases, DLJ argues that the PPM, since it was the central offering document explaining the QT4 Certificates, is properly before the court as part of DLJ's Motion to Dismiss.

Lincoln Life and Lincoln Investment argue that their "complaint makes no reference to the PPM to support its claims. Nor is the PPM central to the claims asserted in the complaint. Plaintiffs have not alleged that there were any misrepresentations or omissions in the PPM." Plaintiffs' Brief Opposing Motion to Dismiss ("Plaintiffs' Response"), pp. 1–2. Instead, argue Plaintiffs, their claims are based solely on the document provided to them on December 5, 1995, which contained the allegedly understated investment performance statistics. Plaintiffs claim that "[t]his document, and not the PPM, contains the misrepresentations alleged in the complaint." *Id.*, p. 2. The December 1995 statistics document was also attached to DLJ's motion (Exh. C.) and Plaintiffs state that they have no objection to that document being considered for purposes of the present motion. *Id.*, n. 1. Plaintiffs cite the case of *Ninth Avenue Remedial Group v. Allis Chalmers Corp.*, 974 F.Supp. 684 (N.D.Ind. 1997). In that case, the district court noted that it "could consider documents submitted by a defendant attached to a motion to dismiss as part of the pleadings if they are referred to in the plaintiff's complaint and they are central to the claims presented." *Ninth Avenue*, 974 F.Supp. at 686. The court then refused to consider certain documents submitted by defendants in their motion to dismiss because the documents were not referred to in the plaintiffs' complaint. The court held that although the documents may very well constitute "relevant evidence," they were "not necessary to state a claim against the defendants" and therefore were not central to those claims. *Id.*, 974 F.Supp. at 687. Plaintiffs also cited the case of *Tibor Machine Products, Inc. v. Freudenberg–NOK General Partnership*, 967 F.Supp. 1006 (N.D.Ill.1997) (defendant may attach documents to motion to dismiss if they are referred to in plaintiff's complaint and are central to plaintiff's claim). Plaintiffs also cited the case of *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir.1994), wherein the Seventh Circuit held that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."

In addition, Lincoln Life and Lincoln Investment argue that the cases cited by DLJ are inapposite. For example, DLJ also cited the *Wright* case in support of its position. However, in *Wright*, the document at issue was repeatedly referred to by the plaintiff in his complaint. *Id.* In addition, the court held that the document was "central to the § 1983 claim; [plaintiff] alleges that the [document] grants him a property interest in his employment, of which the defendants deprived him without due process of law." *Id.* As a result, the court concluded that the document "was not a matter 'outside the pleading,' and the district court properly considered its contents . . . ." *Id.* Similarly, in the *Burlington* case, even though the Third Circuit held that it was proper for the district court to consid-

er an annual report that had not been attached to or specifically referenced in the plaintiffs' complaint, the court reasoned that the complaint did contain "an unambiguous reference" to data that was contained in that report. *Burlington,* 114 F.3d at 1426. Furthermore, that data formed the basis of plaintiffs' claims. It was for those reasons that the court concluded that "[p]laintiffs cannot prevent a court from looking at the texts of the documents on which its [sic] claim is based by failing to attach or explicitly cite them." *Id.* Similarly, in *Romani,* the offering documents that were considered in that case, while not attached to the complaint, were deemed to be pertinent to the plaintiff's claim of intentional securities fraud. The plaintiff had alleged that the defendants had misrepresented the risks associated with the investment in which plaintiff participated. But the court found that the offering documents were "replete with statements, some highlighted, emphasizing the high risks involved with [the investment]." *Romani,* 929 F.2d at 879. In that respect, the court found that the documents were properly considered a part of the pleadings. In the present case, the Plaintiffs do not dispute that the PPM was also replete with warnings about the potential risk associated with the QT4 Certificates. However, the Plaintiffs are not alleging that DLJ misrepresented the *risk.* Rather, they are claiming that the statistics for November of 1995, as reported in the December 5 document rather than the PPM, were understated to such an extent that they misrepresented the *performance* of the Certificates. As will be discussed in more detail below, Lincoln Life and Lincoln Investment claim that these figures played a material part in their decision to purchase $40 million worth of the Certificates. There is a distinction, then, between understanding the potential risk involved with a particular investment and understanding the actual performance level for that investment. Finally, Plaintiffs' counsel stated at oral argument that their "claims of securities law violations and mutual mistake deal with November 1995 and December 1995 statistics. The Private Placement Memorandum was May 1995; [it] could not possibly form the basis or be central to our claim."

The PPM was not attached to the Plaintiffs' Complaint. Nor was the PPM quoted, discussed, or even referenced in the Complaint. While the PPM, with all its warnings and cautionary statements, is clearly evidence that would be relevant at trial, and may very well be central to DLJ's defense, the court determines that it is not central to the claims asserted by the Plaintiffs. Accordingly, the Private Placement Memorandum attached as Exhibit A to DLJ's Motion to Dismiss will not be considered by the court in its analysis of that motion.

**2. Plaintiffs' Claims Under the Indiana Securities Act.**

DLJ argues that Lincoln National and Lincoln Investment fail to state a claim for misrepresentation under the Indiana Securities Act. DLJ's first argument is that the Complaint fails "to allege a misrepresentation *by DLJ* with respect to the November 1995 delinquency and REO rates." Defendant's Memorandum, p. 10 (italics in original). DLJ argues that Lomas Mortgage USA, Inc. ("Lomas") was the company that was responsible for servicing the loans and providing statistical data concerning performance of the underlying mortgage pools. According to DLJ, it was Lomas, not DLJ, that provided the information that Plaintiffs claim constituted a material misrepresentation. DLJ argues that "[w]ithout a misrepresentation *by DLJ,* however, there can obviously be no misrepresentation claim *against DLJ." Id.,* p. 11 (italics in original). Thus, according to DLJ, it cannot be held liable under the Indiana Securities Act, I.C. § 23-2-1-12(2), for any misrepresentations or omissions that may have been passed on to Plaintiffs.

DLJ cites several cases in support of this argument. In *Buford White Lumber Co. v. Octagon Properties, Ltd.,* 740 F.Supp. 1553 (W.D.Okla.1989), the court held that a law firm that helped prepare an offering memorandum could not be held liable for securities fraud because the firm "did not undertake to prepare, evaluate the accuracy of, or opine upon the accuracy of financial statements by the [offeror] and said so." *Buford,* 740 F.Supp. at 1563. In *Friedman v. Arizona*

*World Nurseries Ltd. Partnership,* 730 F.Supp. 521 (S.D.N.Y.1990), the court held that financial projections included in a tax opinion contained in a partnership offering document did not constitute representations by the accountant who drafted the opinion. DLJ also cited two other district court cases holding that accountants could not be held liable under securities laws for preparing reports or opinions based on statistics supplied by other parties. Defendant's Memorandum, p. 13, n. 11 (citing *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222 (S.D.N.Y.1989) and *Stevens v. Equidyne Extractive Indus.,* 694 F.Supp. 1057 (S.D.N.Y.1988)). Since DLJ did not provide the statistics that form the basis of Plaintiffs' Complaint, the company claims it cannot be held liable and so the Complaint fails to state a claim.

DLJ next argues that even assuming Plaintiffs can attribute any alleged misrepresentations to the Defendant, they "fail adequately to allege the materiality of the supposed misrepresentations." Defendant's Memorandum, p. 13. DLJ claims that "[w]ith respect to the materiality of supposed misrepresentations concerning November 1995 delinquency and REO rates, the best that plaintiffs can muster is that the rates were 'substantially understated.'" *Id.,* p. 14 (quoting Complaint, ¶ 23). DLJ claims that there were "no allegations as to actual rates or as to the relative size of DLJ's alleged understatement." *Id.* As to the inaccurate projections in the models provided in December of 1995, the Complaint claims that these projections were misleading because DLJ "failed to disclose the fact that [the] projections were based on a severity rate which had already been exceeded and that the delinquency, REO, severity and default rates had already increased on the pools." Complaint, ¶ 23. DLJ argues that "[t]he complaint ... fails to allege the size of the actual December severity, fails to allege whether that actual severity was reported by Lomas or [was] somehow redetermined by plaintiffs, and fails to allege whether DLJ was aware of any such circumstances." Defendant's Memorandum, p. 16. In addition, DLJ states that "the allegation that the December 1995 severity rate was higher than the 25% severity assumption is obviously irrelevant, since the assumption appears in rate of return models dated as of December 4, well before December 31, the earliest date at which the December severity could possibly have been calculated by Lomas and reported to DLJ ..." *Id.,* pp. 16–17. Finally, DLJ points out that the following statement appeared at the bottom of every page of the December 1995 Models: "[DLJ] makes no representation that such analyses or calculations are accurate or that such valuations represent the levels where actual trades may occur. Investors should rely on the information contained in or filed in connection with the prospectus/prospectus supplement." Defendant's Motion, Exh. C. Accordingly, DLJ claims that Plaintiffs cannot state a claim against it for any misrepresentation.

As to DLJ's first argument, the Plaintiffs argue that "DLJ cites utterly no authority— under the Indiana Securities Act or under *any* securities act—to support its suggestion that a *seller* of a security can avoid liability for its misrepresentations by disclosing that the information came from a third party." Plaintiffs' Response, p. 7 (italics in original). The Plaintiffs further argue that "[t]he only authorities cited by DLJ address the liability of professionals such as accountants and attorneys who assisted in the drafting of the offering materials, rather than the liability of the actual sellers of the securities themselves." *Id.,* n. 4. Lincoln Life and Lincoln Investment argue that the applicable provision of the Indiana Securities Act, I.C. § 23–2–1–12, does not support the argument that a seller of securities is only liable for a misrepresentation "if the seller made up the untrue statement himself." *Id.,* p. 8. The relevant Code section provides:

> It is unlawful for any person in connection with the offer, sale or purchase of any security, either directly or indirectly,
>
> . . .
>
> (2) To make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of circumstances under which they are made, not misleading
>
> . . .

I.C. § 23–2–1–12. Furthermore, the Plaintiffs claim that the penalties provision of the

Indiana Securities Act contains language that also refutes DLJ's position. That section provides, in relevant part, that "[a] person who offers or sells a security in violation of this chapter, and who does not sustain the burden of proof that the person did not know and in the exercise of reasonable care could not have known of the violation, is liable to any other party to the transaction who did not knowingly participate in the violation ..." I.C. § 23–2–1–19. Accordingly, argue Lincoln Life and Lincoln Investment, DLJ cannot avoid liability based simply on its claim that any violation was committed by a third party. In support of their argument, Plaintiffs cite the case of *Manns v. Skolnik,* 666 N.E.2d 1236 (Ind.App.1996). That case also involved an action under § 12(2) of the Indiana Securities Act. The court discussed that specific subsection at length. The court wrote:

> Viewing the statutory framework, it seems clear that the legislative intent was to regulate the information which must be disclosed in connection with a security transaction. The statute requires that material information be disclosed. This statute turns entirely on whether the information disclosed was accurate, if disclosed at all. If material information is either misrepresented or omitted entirely, then the statute has been violated. The statutory language only requires that the individual disclose material information "in order to make the statements made in the light of circumstance under which they are made, not misleading." I.C. § 23–2–1–12(2). Hence, the plain language of the statute leads us to conclude that a violation occurs irrespective of the individual's intent to defraud.

> Moreover, our determination is supported by comparing I.C. § 23–2–1–12(2), the subsection at issue in this case, to the remaining two subsections in the statute. The first subsection, I.C. § 23–2–1–12(1) makes it unlawful to "employ any device, scheme or artifice *to defraud*"; the other subsection makes it unlawful to engage in a manner which "operates or would operate *as fraud or deceit upon any person.*" I.C. § 23–2–1–12(1), (3) (emphasis added). Such language is absent from the subsection at issue in this case. Given the fact

that the other two subsections expressly include as an element an intent to defraud but subsection two does not, we conclude that an intent to defraud is not a required element under I.C. § 23–2–1–12(2). *See Trabue v. State,* 164 Ind.App. 409, 328 N.E.2d 743, 744 (1975) (holding that when a limitation is imposed in a particular instance, the limitation will not be read into other statements in which it is not specifically provided). Rather, for a violation of I.C. § 23–2–1–12(2) to occur, an individual must only make material misrepresentations or omit material information, regardless of intent.

*Manns,* 666 N.E.2d at 1248–49. Finally, the Plaintiffs argue that the "inclusion [in I.C. § 23–2–1–19(a) ] of language requiring the exercise of reasonable care demonstrates that a seller cannot blindly parrot someone else's information to potential investors without exercising due diligence to ensure that that information is accurate." Plaintiffs' Response, p. 9. In its reply brief, DLJ argues that the Plaintiffs' reliance on the reasonable care language contained in I.C. § 23–2–1–19(a) "is misplaced. Subsection 19(a)—which provides an affirmative defense to a Section 12 claim if the defendant 'did not know and in the exercise of reasonable care could not have known of the violation'—is intended for situations where a defendant is being sued on a derivative liability theory." *See, e.g., Arnold v. Dirrim,* 398 N.E.2d 426, 433 (Ind. App.1979). Since plaintiffs make no claim that DLJ is somehow vicariously liable for securities law violations by Lomas, Subsection 19(a) is irrelevant." Defendant's Reply, p. 5. At oral argument, Plaintiffs counsel acknowledged that the *Arnold* case "was discussing that affirmative defense ... in a derivative liability context." However, counsel went on to point out that subsection (a) of section 19, which applies exclusively to sellers of securities, contains the reasonable care language, as does subsection (b), which applies to purchasers of securities, *and* subsection (c), which applies to persons who give advise with respect to securities. Subsection (d) applies the same standard to "[a] person who directly or indirectly controls a person liable under subsection (a), (b), or (c) ...." Thus, Plaintiffs argued, subsection (d), which

was the subsection at issue in the *Arnold* case, provides for vicarious liability for violations of the Indiana Securities Act. However, that does not mean that section 19 applies exclusively in cases involving derivative liability. Subsections (a), (b) and (c) clearly impose liability *directly* on a seller, purchaser, or financial advisor who violates the Act unless that seller, purchaser, or financial advisor can sustain its burden of establishing that it "did not know and in the exercise of reasonable care could not have known of the violation ...." The Plaintiffs' theory, of course, is that even if Lomas provided the misstated statistics, DLJ would be liable unless it could prove an affirmative defense pursuant to subsection 19(a). Thus, DLJ's argument that the language in 23–2–1–19(a) is irrelevant to the present case is unconvincing.

Finally, the Plaintiffs argue that DLJ's attempt to avoid liability on the basis that Lomas actually supplied the allegedly misstated statistics "is belied by the DLJ Statistics Document itself." *Id.,* p. 10. They point out that the " 'November 1995 Deal Statistics' section of [the December 1995 Report], which contains the misstated delinquency and REO statistics, states that the statistics therein were derived from both 'internal and external sources.' " Plaintiffs' Response, p. 10. Actually, that statement goes on to say that the information in the Report is based on information that DLJ "believes to be reliable, but DLJ does not guarantee its accuracy or completeness." Defendant's Motion, Exh. C, p. 13. Nonetheless, the Plaintiffs maintain that the words "internal and external sources" serve to undermine DLJ's contentions that Lomas was solely responsible for the alleged inaccuracies in the Report and that DLJ did not know or could not have discovered the misstatements. For all of these reasons, DLJ's argument that the Plaintiffs fail to state a claim for a violation of the Indiana Securities Act by failing to allege a misrepresentation by DLJ itself must fail. The arguments presented by DLJ on that issue go more to DLJ's theory of defense in this case than to the sufficiency of the complaint. While these arguments may form the basis for a valid and perhaps even strong defense to the claims levied by Lincoln Life and Lincoln Investment, they do not suffice to establish that the Plaintiffs can prove no set of facts to support their claim.

The court in *Manns* held that once it is determined that a misrepresentation or omission was made (or in this case sufficiently pled), a court must determine whether a defendant "violated the statute by either omitting or misrepresenting *material information* that a reasonable investor would have considered important in making an investment decision." *Manns,* 666 N.E.2d at 1249 (citation omitted). This, of course, is the second part of DLJ's argument with regard to the Plaintiffs' claim under the Indiana Securities Act. DLJ points out that "[c]laims under ... the Indiana Securities Act must be predicated on untrue statements of *material* fact or material omissions." Defendant's Memorandum, p. 13. DLJ then cites numerous cases wherein courts have dismissed securities cases similar to the present case after determining that the alleged misrepresentation was simply not material. *Id.,* pp. 13–14.[5] DLJ claims that the Plaintiffs "allegations ... are wholly inadequate in this regard. With respect to the materiality of supposed misrepresentations concerning November 1995 delinquency and REO rates, the best that plaintiffs can muster is that the rates were 'substantially understated.' " *Id.,* p. 14. DLJ maintains that Lincoln Life and Lincoln Investment have failed to state a claim since their Complaint contains "no allegations as to actual rates or as to the relative size of DLJ's alleged understatement." *Id.*

The Plaintiffs point out that an omission or misrepresentation "is material if a reasonable investor would have considered it important in making an investment decision." Plaintiffs' Response, p. 10 (citing *Manns,* 666 N.E.2d at 1249; *Arnold,* 398 N.E.2d at 433). In *Arnold* the court held that "[t]he central consideration in determining materiality is

---

5. The cases cited by DLJ involved situations where the alleged omission or misrepresentation resulted in rather insignificant financial losses. *Burlington,* 114 F.3d at 1427 (undisclosed information resulted in cost increases of only 0.2%); *Glassman v. Computervision Corp.,* 90 F.3d 617, 633 (1st Cir.1996) (undisclosed information amounted to less than 3% of budgeted revenues); *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 714–15 (3d Cir.1996) (misstatement would have resulted in only 0.54% reduction in net income).

whether a reasonable investor would attach importance to the information when deciding on his course of action." *Arnold,* 398 N.E.2d at 433. In *Manns* the court held that "'[t]here must be a substantial likelihood that the disclosure of the [misstatement or the] omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of the information made available.'" *Manns,* 666 N.E.2d at 1249, n. 8 (quoting *TSC Indus. Inc., v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). In the present case, the Plaintiffs claim that the delinquency and REO rates were used in an "econometric model" that was utilized to determine an appropriate price for the QT4 Certificates. Plaintiffs' Response, p. 11. At oral argument Plaintiffs' counsel stated that "[t]he statistics ... were factored into the econometric model, which determined the price, and also were factored into the cash flow projections and the analysis that Lincoln Investment Management did on [the Certificates]." Plaintiffs also point out that the Seventh Circuit, in a case involving a Rule 10b–5 action, held that "'the determination of materiality requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact;' thus a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 370 (7th Cir.1997) (citations omitted). In *In re First Chicago Corp. Securities Litigation,* 769 F.Supp. 1444, (N.D.Ill.1991), the district court noted that "[m]ateriality has been characterized as a mixed question of law and fact, and courts have admonished that '[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law.'" *First Chicago,* 769 F.Supp. at 1451(quoting *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628, 641 (3d Cir.1989)).

The Plaintiffs also dispute DLJ's argument that their claim that the statistics were "substantially understated" is too vague and general to meet the materiality requirement. The Plaintiffs argue that "[n]one of the cases cited by DLJ for this proposition dismissed a complaint because the complaint failed to quantify the extent of the misstatement; they only dismissed complaints that *on their face* showed that the facts misrepresented were immaterial." Plaintiffs' Response, p. 12 (italics in original). That indeed appears to be the case, as pointed out in footnote five above. Plaintiffs' counsel admitted at oral argument that the Plaintiffs could not precisely quantify the degree to which the statistics were allegedly understated. Counsel stated that "discovery will have to give us the precise amount." However, she added that based on the difference between the purchase price and the level at which the securities were currently trading, the Plaintiffs had "sustained a loss of approximately two-thirds of the investment." As was the case with DLJ's argument that it simply passed along statistics provided by Lomas and so could not be liable for misrepresentation, its arguments that the misrepresentation alleged to have occurred in this case was not material go more to a defense on the merits. DLJ's arguments certainly bear on the issue of whether a reasonable investor would have considered the allegedly understated statistics material to the decision to purchase the Certificates. But they do not suffice to establish that the alleged misrepresentation was immaterial as a matter of law. For these reasons, DLJ's Motion to Dismiss the Plaintiffs' claim under the Indiana Securities Act must be denied.

### 3. Plaintiffs' Claim of Mutual Mistake.

As stated previously, Lincoln Life and Lincoln Investment present an alternative argument that the underlying transaction should be rescinded on the basis of mutual mistake. The Plaintiffs claim that the allegedly understated statistics "were the basis both for DLJ in setting the price for the [QT4] Certificates and for Lincoln Life and [Lincoln Investment] in deciding to purchase the securities." Plaintiffs' Response, p. 15. The Plaintiffs claim that since both parties were mistaken about the statistics, the doctrine of mutual mistake forms the basis for rescission of the entire transaction. DLJ argues that the Plaintiffs cannot state a claim for mutual mistake since they bore the risk

of the mistake. As DLJ points out, "a party may not claim mutual mistake if it 'bears the risk' of the mistake." Defendant's Memorandum, p. 18 (quoting *Restatement of Contracts (Second)* § 152 (1981)). DLJ goes on to argue that:

> Section 154 of the *Restatement* provides that "[a] party bears the risk of a mistake when ... he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates *but treats his limited knowledge as sufficient.*" ... Here, plaintiffs had limited knowledge as to the details of Lomas' performance but chose to bear the risk of statistical errors and poor judgments by the servicer of the underlying loans, just like any other investor in a subordinated mortgage-backed security ....

*Id.* (italics in original). DLJ also claims that the Plaintiffs' mutual mistake claim must be dismissed since the alleged mistake involving the statistical report did not go to the essence of the transaction. *Id.*, p. 19. DLJ cites, among others, the case of *Jackson v. Blanchard,* 601 N.E.2d 411 (Ind.App.1992). In *Jackson* the court held that:

> It is not enough that both parties are mistaken about any fact; rather, the mistaken fact complained of must be one that is of the essence of the agreement, the *sine qua non,* or, as is sometimes said, the efficient cause of the agreement, and must be such that it animates and controls the conduct of the parties.

*Jackson,* 601 N.E.2d at 416. In the present case, DLJ claims that Plaintiffs base their mutual mistake claim on two statistics prepared by Lomas—the November 1995 REO and delinquency rates in the December 1995 Report. DLJ argues that "Plaintiffs make no effort to allege how these snippets of information go to the essence of the QT4 Certificates' overall performance. The ultimate return on a complex instrument like the Certificates depends on numerous, changing factors. The November 1995 delinquency and REO rates do not comprise the essence of the QT4 Certificates but represent only two bits of data among the mass of information relevant to the value of the Certificates." Defendant's Memorandum, pp. 19–20. Accordingly, argues DLJ, Plaintiffs "have failed to state a claim for mutual mistake." *Id.,* p. 20.

For their part, the Plaintiffs claim that "Indiana law does not follow the Restatement section cited by DLJ." *Id.,* p. 15. Plaintiffs cite the case of *Wilkin v. 1st Source Bank,* 548 N.E.2d 170 (Ind.App.1990). In that case, a bank, as the personal representative of an estate, sold the decedent's home to the plaintiffs. After the closing, the plaintiffs complained that the home had been left very cluttered and would require cleaning. The bank and the plaintiffs agreed that if the plaintiffs would clean the home themselves they could keep any personal property that had been left there. When the plaintiffs did so, they discovered that the "junk" that was left in the house happened to include works of art. According to Plaintiffs, "[u]nder section 154 of the Restatement, on which DLJ relies, the mistake concerning what was included in the personal property would unquestionably have been borne by the bank and the estate. *See* Restatement § 154, comment a (seller of farmland cannot avoid sale upon later discovery by both parties that land had valuable mineral deposits)." *Id.,* p. 16. Thus, according to the Plaintiffs, under § 154 of the *Restatement,* rescission could not be had in that situation. In *Wilkin,* however, the court held that the sales contract *could* be rescinded based on mutual mistake. The court wrote:

> Where both parties share a common assumption about a vital fact upon which they base their bargains, and that assumption is false, the transaction may be avoided if because of the mistake a quite different exchange of values occurs from the exchange of values contemplated by the parties.

*Id.* (quoting *Wilkin,* 548 N.E.2d at 170). Also, the Plaintiffs claim that the inaccurate information provided constituted a mistake regarding vital facts on which the contract of sale was based. That is, according to the Plaintiffs, the calculation of the sale price and potential return on the certificates was wrong. The Plaintiffs maintain that "[t]he fact that the underlying pool of mortgages had a significantly higher delinquency and REO rate than the parties believed" is material and goes to the essence of the transaction. *Id.,* p. 18.

DLJ attempts to distinguish the cases cited by the Plaintiffs. For example, DLJ claims that the *Wilkin* case is inapposite because "[t]here is no suggestion that the [bank] was 'aware at the time the contract was made, that it had only limited knowledge with respect to the facts to which the mistake relates but treated its limited knowledge as sufficient.'" Defendant's Memorandum, p. 10 (quoting *Restatement* § 154). In the present case, argues DLJ, the Plaintiffs "had limited knowledge as to the details of Lomas' performance but chose to bear the risk of statistical errors and poor judgments by the servicer of the underlying loans, just like any other investor in a subordinated mortgage-backed security." *Id.*

The debate over the applicability of § 154 of the *Restatement* is an academic exercise in which the court need not indulge in order to rule on DLJ's Motion to Dismiss the Plaintiffs' mutual mistake claim. That is because the court finds DLJ's argument that the Plaintiffs bore the risk of errors by Lomas unconvincing. The risk that the Plaintiffs bore was the risk of losing money on their investment. That of course is a risk that every investor bears, and a claim for mutual mistake could obviously not be based on a loss sustained by an investor absent a belief by the investor and the seller that the security in question would produce a specific rate of return.[6] But the Plaintiffs' argument in this case is that they and DLJ shared a common assumption at the time of the purchases that the delinquency and REO rates in the December 1995 Report were at a particular level when in fact they were substantially higher. As a result, the price negotiated for the purchases was the result of the parties' mutual mistake about the performance level of the underlying loans. The argument that the Plaintiffs assumed the risk of Lomas' actions might be valid if, for example, the Plaintiffs were aware at the time they purchased the Certificates that Lomas was prone to submit erroneous statistical data, but the Plaintiffs made the investment anyway. But that is not the situation in this case. To argue that Lincoln Life and Lincoln Investment bore the risk of errors by Lomas would be akin to saying that a negligent driver is not liable for crashing into a careful driver because all careful drivers bear the risk of being hit by one who is careless. In any case, Indiana case law makes clear that the doctrine of mutual mistake applies where parties "share a common assumption about a vital fact" and that vital fact is one that goes to "the essence of the contract." The Plaintiffs have pled that they and DLJ based their contract on the assumption that the delinquency and REO rates were at a different level than they actually were. This is sufficient for purposes of defeating a motion to dismiss. Accordingly, DLJ's Motion to Dismiss the Plaintiffs' claim of mutual mistake is denied.

### 4. The Particularity Requirements of Fed.R.Civ.P. 9(b).

As DLJ properly states, Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." DLJ further points out that "[t]o meet this requirement, 'a complaint must specify the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" Defendant's Memorandum, p. 20 (quoting *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir.1990)). The court in the *First Chicago* case noted that "[t]hree purposes are served by this heightened standard: (1) the filing of 'strike suits' or complaints as pretexts for the discovery of unknown wrongs is inhibited; (2) defendants are protected from the harm that results from charges of serious wrongdoing; and (3) defendants are ensured notice of the conduct complained of, enabling them to prepare a defense." *First Chicago*, 769 F.Supp. at

---

6. At oral argument, DLJ's counsel discussed the case of *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Assoc., Inc.*, 692 N.E.2d 905, 1998 WL 111687 (Ind.App.). The court in *Jay County* held that the doctrine of mutual mistake does not apply to permit a party to rescind a contract on the basis of a risk it knew was inherent in the agreement. This holding would only have a bearing on the present case if Lincoln Life and Lincoln Investment based their mutual mistake claim solely on the fact that they lost money on their investment, which of course is not what they have done.

1452 (citations omitted). However, it is also true that "Rule 9(b) ... does not render Rule 8 inapplicable to fraud cases.[7] Rather, the two rules must be read together." *Nicholas v. Poughkeepsie Savings Bank, et al.,* 1990 WL 145154 *3, 1990 LEXIS 12677 *8 (S.D.N.Y.) (citations omitted). Furthermore, it has been held that "in applying Rule 9(b), 'focusing exclusively on its particularity language is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" *Seville Industrial Machinery Corp. v. Southmost Machinery,* 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) (citations omitted).

In the present case, DLJ cites eight paragraphs from the Plaintiffs' Complaint which it claims show a lack of particularity. These include, for example:

> Paragraph 13: fails to allege the identity of DLJ and Lincoln representatives, and the time, place and manner of the representations alleged therein.
>
> Paragraph 14: fails to allege the source, and the time, place and manner of the 'various statistics, analyses and projections' alleged therein; [and]
>
> Paragraph 20: fails to allege the source, and the time, place and manner of the devaluations, loss in value, and 'reported statistics' alleged therein.

Defendant's Memorandum, p. 21. Essentially, DLJ cites paragraphs from the Complaint and attempts to argue that they lack sufficient specific information regarding the nature of the Plaintiffs' fraud claim. In its reply, DLJ claims that the Plaintiffs should amend their Complaint and that "[a]ll of the items outlined in DLJ's opening memorandum [that is, the eight paragraphs referred to above] are required so that the complaint may be understood in light of the PPM and other documents provided to plaintiffs prior to their purchase of the QT4 Certificates." Defendant's Reply, p. 12.

The Plaintiffs argue, however, that "[p]ursuant to the procedure agreed to at the preliminary pretrial conference on January 7, 1998, Lincoln [Life] and [Lincoln Investment] provided DLJ with the DLJ Statistics Document in lieu of filing an amended complaint to identify the foregoing circumstances of DLJ's misrepresentations." Plaintiffs' Response, p. 19. DLJ even admitted that "[a]t the preliminary pretrial conference on January 7, the Magistrate Judge suggested that in advance of DLJ's proposed motion to dismiss, plaintiffs might amend the complaint to identify the documentary sources of DLJ's alleged misrepresentations. In lieu of this procedure, plaintiffs agreed to identify such documents to DLJ." Defendant's Memorandum, p. 12, n. 10. Furthermore, the Plaintiffs argue that the Statistical Report itself serves to sufficiently identify the "time, place and content of the misrepresentation" in that it includes names of DLJ representatives, the date the Report was transmitted to the Plaintiffs, and, of course, the text of the Report wherein the alleged misrepresentations appear. Plaintiffs' Response, pp. 19–20. Finally, the Plaintiffs point out that "[i]t is only the fraud that need be pleaded with particularity under Rule 9(b), not background facts such as those listed by DLJ." *Id.,* p. 20. Based on those facts, and the fact that the Complaint contains nearly 8½ pages of factual background regarding the alleged fraud or misrepresentation, the court determines that the particularity requirements of Rule 9(b) have been met. Furthermore, it was clear from the oral argument on April 14 that DLJ is keenly aware of the nature of the Plaintiffs' allegations and the factual basis for them. DLJ has not established that it has been hindered in any way in preparing a defense to the claims asserted by Lincoln Life and Lincoln Investment. Accordingly, the Motion to Dismiss for failure to satisfy Rule 9(b) is denied.

### CONCLUSION

For the foregoing reasons, the Motion to Dismiss filed by the Defendant, Donaldson, Lufkin & Jenrette is **DENIED**.

---

7. Rule 8, of course, provides that in general a Complaint is sufficient when it contains only "a short and plain statement of the claim ...."